[Civ. No. 57179. Second Dist., Div. Five. Sept. 16, 1980.]

FRED E. AENGST, Plaintiff and Appellant, v.
BOARD OF MEDICAL QUALITY ASSURANCE,
Defendant and Respondent.

COUNSEL

Allan M. Bower for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Steven M. Kahn, Deputy Attorney General, for Defendant and Respondent.

OPINION

**DOWDS, J.**\*—Appellant, a physician specializing in otolaryngology, was found guilty in a disciplinary proceeding of gross negligence in the treatment of Damian Huber, a four-year-old boy, and we summarize the pertinent testimony at the administrative hearing. He operated on Damian on March 14, 1972, and removed his tonsils and adenoids. Damian was discharged from the hospital on March 15 and he and his mother went to the home of her sister, Mrs. Tinsley. Damian was listless and pale but Mrs. Huber observed no bleeding on March 15 or during the day on March 16. According to her testimony, at dinner the night of the 16th between 7:30 and 8 p.m., Damian started coughing and began to cough up bright red blood. A plastic mixing bowl, about eight to nine inches in diameter and about six and one-half inches high, was obtained and the material Damian coughed up filled about half the bowl. In addition some of the blood splattered on Damian, his mother, the table, the chair and the floor. Mrs. Huber cleaned up Damian and carried him into the den. She laid him down and he turned white and went to sleep, apparently breathing normally.

Mrs. Huber testified that at that point, about 8:30 p.m. she went to the bedroom to call appellant. Her sister stood in the doorway, about 12 to 16 feet away. A woman answered the telephone and, when Mrs. Huber said she wished to talk to Dr. Aengst, the woman asked for her telephone number and told her to wait. Dr. Aengst came on the phone,

---

\*Assigned by the Chairperson of the Judicial Council.

according to Mrs. Huber's testimony, and she told him Damian had been lethargic, had a low fever, wasn't eating well and that he had just coughed up a half bowl full of bright red blood. Dr. Aengst asked what Damian was doing and was informed that he had turned white and gone to sleep. He told Mrs. Huber not to wake Damian and to bring him into the office at 10 the next morning, but to feel free to call him if there was further bleeding.

At about 11 that evening, Damian coughed up some more blood, but less than before. Mrs. Huber had Damian rinse his mouth, laid him down and returned to the bedroom to call appellant. After again first talking to a woman who answered the phone, she spoke to appellant and told him that Damian had coughed up more blood and that she was very concerned. Dr. Aengst asked what Damian was doing now and was told that he was lying down and that when Damian rinsed his throat the saliva was red. Dr. Aengst told Mrs. Huber to come to his office at 10 in the morning and if Damian had a bleeder point, he would cauterize it.

Susan Tinsley, Mrs. Huber's sister, testified that she had been out the evening of the 16th but arrived home about 8 p.m. She saw the blood on the floor and in the mixing bowl, which she recalls as being about half full. When she had been home about 20 to 30 minutes she accompanied her sister into the bedroom and heard her sister's end of the conversation with appellant. Her recollection of what was said to Dr. Aengst substantially conformed to Mrs. Huber's. She placed the time of the telephone call at about a quarter to nine. She also confirmed her sister's testimony about what was said by her to appellant in the second telephone call, which she placed at 11 or 11:05 p.m.

At about 10 the next morning, Mrs. Huber took Damian to appellant's office. He examined Damian's throat, said there was a little clot which he thought he could get out and was treating Damian with a rubber hose with a metal tip when Damian suddenly collapsed. Dr. Aengst picked up Damian and he and Mrs. Huber rushed him to a hospital in Mrs. Huber's car, but Damian was dead on arrival or shortly thereafter.

An accusation was filed with the Division of Medical Quality of the Board of Medical Quality Assurance alleging that appellant was subject to disciplinary action in that he was grossly negligent and grossly incompetent in his treatment of Damian. A hearing was held before a

panel of the Medical Quality Review Committee with an administrative law judge presiding. Mrs. Huber and her sister testified in the manner summarized above. Employees of appellant's telephone exchange identified records indicating that Mrs. Huber had called Dr. Aengst at 8:44 p.m. and 11:12 p.m. on March 16, 1972, and had been connected to him. Two medical experts testified that, assuming Dr. Aengst did receive the information Mrs. Huber said she imparted to him, it was an extreme departure from proper care not to have the child taken immediately to an emergency hospital.

Appellant testified at the administrative hearing and denied receiving any telephone call from Mrs. Huber between 8 and 9 p.m. the night of March 16, 1972. He testified that he was treating a Jeffrey Bickel at Arcadia Methodist Hospital until 8:25 or 8:30 and then went to see Lorraine O'Brien, a patient of his in the same hospital and was with her for about 15 minutes. Following that he drove home, an 18 to 20 minute trip, arriving there at 9 p.m. or later. Jeffrey's mother confirmed that appellant treated him in the emergency room of the hospital, starting about 7:30 p.m. After Dr. Aengst left, Jeffrey felt faint and they remained in the emergency room about five minutes longer, leaving about 8:30 p.m. Hospital records indicated Jeffrey left at 8:13 but, according to a nurse there, this does not mean a doctor was with him until then. Mrs. O'Brien testified that Dr. Aengst saw her in the hospital that night just before visiting hours were over or just afterwards. Visiting hours were over about 8 p.m.

Appellant stated that he did receive a telephone call from Mrs. Huber about 11 p.m. but that she merely told him that Damian had difficulty in swallowing and complained of pain in his throat. He asked if Damian had an elevated temperature, and if he had been bleeding or had any breathing difficulties and all answers were negative. He told Mrs. Huber to use Tylenol and said that he would be happy to see her that night in the emergency room of a hospital or she could come to his office in the morning. She elected, he said, to come to the office the next morning. Appellant's receptionist testified that the morning of Damian's death Mrs. Huber told her she had only called Dr. Aengst once the night of the 16th and she did not tell him of Damian's bleeding because she did not wish to upset the other children and her relatives who were present. Mrs. Huber denied this conversation. An investigator confirmed appellant's testimony that it is an 18 to 20 minute drive from Arcadia Methodist Hospital to appellant's home and medical experts supported appellant's actions based on his version of the facts. Appel-

lant also offered to produce evidence respecting a polygraph examination of himself, a matter which we shall discuss in more detail later in this opinion.

Following the hearing, the panel proposed a decision determining that appellant was guilty of gross negligence in failing to advise Mrs. Huber to take her son to an emergency hospital the night of March 16, 1972, imposing but staying a suspension from practice of medicine for six months and placing appellant on probation for one year. Respondent adopted this proposed decision as its own. A petition for writ of mandate under Code of Civil Procedure section 1094.5 was filed with the superior court, an alternative writ was issued, a hearing was held and judgment was entered denying the petition and discharging the alternative writ. This appeal followed.

■ Appellant's principal contention on appeal is that the administrative law judge erred in excluding evidence concerning appellant's polygraph examination and that the trial judge compounded the error in upholding this decision. Appellant urges that the exclusion of this evidence was an egregious mistake because the outcome of the proceeding depended upon the relative credibility of the testimony of appellant on the one hand and Mrs. Huber and her sister on the other respecting the alleged telephone calls on the night of March 16, 1972.

Appellant's counsel, at the administrative hearing, made an offer of proof that Frederic Martin, a qualified polygraph operator, would testify that in a polygraph examination appellant was asked the following questions and gave the following answers:

"Have you taken any type of medication, drug or narcotic in a means to attempt or control to defeat the purpose of this test?

"Answer: No.

"Did Mrs. Huber in her telephone conversation with you during the evening prior to her son Damien's death inform you that he had been bleeding profusely?

"Answer: No.

"Did Mrs. Huber in her telephone conversation with you during the evening prior to her son Damien's death inform you that he had coughed up about a half a bowl full of blood?

"Answer: No.

"Did you have only one conversation with Mrs. Huber via the telephone during the evening prior to her son Damien's death?

"Answer: Yes.

"Did you have two conversations with Mrs. Huber via the telephone during the evening prior to her son Damien's death as she claims?

"Answer: No.

"Are you lying to me today when you claim that you only had one conversation with Mrs. Huber the evening prior to her son Damien's death?

"Answer: No.

"Did you ask Mrs. Huber in the telephone conversation with her the evening prior to her son Damien's death if Damien had been bleeding from his throat?

"Answer: Yes.

"Did Mrs. Huber in the telephone conversation with you during the evening prior to her son Damien's death inform you that he had been bleeding in any manner from his throat?

"Answer: No."

The offer of proof also included proposed testimony by Mr. Martin that the results of the polygraph examination did not indicate any deception in the answers. Counsel also offered the proposed testimony of Chris Gugas, also a qualified polygraph examiner, that he examined the tapes and tracings of the examination and would concur that there was no deception.

Mr. Gugas did in fact testify at a hearing before the administrative law judge but outside of the presence of the panel members. He outlined his extensive training and experience as a polygraph examiner, described how polygraph instruments function, expressed the opinion that the reliability of such tests is "very high, very good," stated that Mr. Martin is a very knowledgeable, conscientious, and experienced polygraph examiner, and opined that the questions asked of appellant were proper ones and the procedures used, as related to the witness by Martin, were appropriate. The administrative law judge sustained respondent's objection to testimony before the panel regarding the polygraph examination and, as previously indicated, the trial court determined this to be a proper ruling.

Counsel have not cited to us and we are not aware of any specific precedent as to the admissibility of polygraph evidence in administrative proceedings. In *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518], we reviewed the state of the law in respect of the use of polygraph evidence in court proceedings and determined that "the great majority of appellate decisions in all jurisdictions have ruled polygraph evidence to be inadmissible" and that "California opinions are with the majority." (*Id.*, at p. 112.) We held in that case, as did our Supreme Court in *People* v. *Carter* (1957) 48 Cal.2d 737, 752 [312 P.2d 665], that "Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results. [Citations.]" We at least implied the same conclusion in *People* v. *Cooper* (1979) 95 Cal.App.3d 844, 850 [157 Cal.Rptr. 348]. It would serve no useful purpose to plough again the same field.

Appellant contends, however, that a different rule should be applied in administrative proceedings. Government Code section 11513, subdivision (c), states in part that in administrative proceedings: "The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions. . . ." A similar argument in a different context was made in *In re Joaquin S.* (1979) 88 Cal.App.3d 80 [151 Cal.Rptr. 508], where appellant contended that polygraph evidence should have been admitted at a hearing to vacate his order of commitment to the California Youth Authority because more liberal rules of evidence apply at such a proceeding. The Court of Appeal ac-

cepted appellant's premise, but declined to rule that the polygraph evidence should have been admitted, stating at page 83: "...In California more liberal evidentiary policies do apply in probation and parole revocation proceedings. (See for example, *People* v. *Vickers*, 8 Cal.3d 451, 456, 457....) However, even in such proceedings, with the relaxed standards of admissibility, the evidence must be relevant and reliable. (See *In re Thomas*, 27 Cal.App.3d 31, 34...; *In re Cook*, 67 Cal. App.2d 20, 24-25....) Polygraph evidence has not yet been established in California courts to pass this rudimentary test of admissibility. 'These tests do not scientifically prove the truth or falsity of the answers given during such tests.' (*People* v. *Jones*, 52 Cal.2d 636, 653....) And as was said in *People* v. *Thornton*, 11 Cal.3d 738, 764...: '[L]ie detector tests themselves are not considered reliable enough to have probative value....'"

The same is true of hearings before a panel of the Medical Quality Review Committee. Even under the rules applicable to administrative proceedings before a tribunal such as that, the evidence must be relevant and reliable. Apart from the general state of the law holding polygraph evidence insufficiently reliable for admission into evidence, there is a particular reason in this case the proffered evidence was properly excluded. Frederic Martin was a "friendly polygrapher" in the sense discussed in *People* v. *Adams, supra.* Martin was apparently employed by appellant to administer the test and, according to respondent's counsel, he knew nothing about it until Mr. Martin was called to the stand. Literature in the field, which we quoted in *Adams*, points out that the subject's fear of detection is the major factor in assuring his augmented physiological response while lying. This aspect of the situation is dramatically altered when the polygraph is arranged by the subject's attorney, because the subject knows that the results of the test, if he is found to be deceptive, will not be used against him. Mr. Gugas' opinion that the subject would nevertheless have a fear that his attorney would find out that he was lying and not work hard for him in the future does not convince us that such an examination meets the standard of reliability.

An independent ground that would justify the exclusion of the polygraph evidence was the failure of appellant to include the names of Mr. Martin and Mr. Gugas in his list of witnesses in advance of the hearing. Although the administrative law judge did not mention this ground of exclusion in his final ruling, during the course of the hearing outside of the presence of the panel he said "[on that ground] I might be inclined

to sustain your objection to receipt of the evidence." The trial court, exercising its independent judgment, determined that the exclusion of the polygraph evidence was proper, but did not indicate on what ground or grounds.

As to the sufficiency of the evidence, our duty on appellate review is to decide whether credible, competent evidence sustains the trial court's determination that appellant was guilty of gross negligence (see *Yakov* v. *Board of Medical Examiners* (1968) 68 Cal.2d 67, 69 [64 Cal.Rptr. 785, 435 P.2d 553]). We are satisfied that the trial court's determination is so sustained.

The judgment is affirmed, respondent to recover its costs on appeal.

Kaus, P. J., and Stephens, J., concurred.