[Crim. No. 11663. Fourth Dist., Div. One. Apr. 16, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH R. BERRY, Defendant and Appellant.

## COUNSEL

Brav & Schwartz and Nelson P. Brav for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Richard D. Garske and J. Richard Haden, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STANIFORTH, J.**—A jury convicted Kenneth R. Berry of conspiracy to defraud (Pen. Code, § 182, subd. 4); two counts of grand theft (Pen. Code, § 487); attempted grand theft in counts four through ten (Pen. Code, §§ 664/487, subd. 1); forgery in counts eleven through fifteen (Pen. Code, § 470). The trial court sentenced Berry to local custody, one year imprisonment on count two, and a consecutive six-month sentence on count three. Berry asserts ineffective assistance of defense counsel pretrial required dismissal of the proceedings. Berry contends his lengthy tape-recorded interrogation conducted by the deputy district attorney in the San Diego County jail, plus a followup recorded interrogation in the district attorney's office and a polygraph administered by the Department of Justice polygrapher were products of poor legal advice.

The trial court, following a pretrial evidentiary hearing, generalized there was "attorney malfunction" at early stages of the prosecution but denied Berry's motion to dismiss.

### FACTS —PRETRIAL MOTION TO DISMISS

Berry was arrested on multiple charges of real estate fraud. He was advised of his *Miranda* rights and stated he wanted "to consult an attorney." Retained counsel (Roger L. Thompson) visited him and was

informed of the nature of the conspiracy, grand theft, attempted grand theft and forgery charges made. After Berry's arraignment, his counsel spent two hours viewing discovery matters in the prosecutor's office (about one-half of discovery material was then available). Several witness interviews were not completed by the prosecution and no handwriting comparisons had been done at this point. Defense counsel did not seek independent interviews with witnesses nor his own expert handwriting evaluation.

Attorney Thompson was of the opinion such efforts were unnecessary since Berry had told him what documents he had signed in another's name. Berry admitted to his lawyer he had instructed codefendant John Hull to set up mail services in La Jolla under phony names. He told Thompson he and codefendant Faucher, a real estate broker, had met with a Mexican lawyer using fictitious names to transfer money to Mexico. Berry denied any criminal intent and claimed Faucher had misled him into believing there were powers of attorney authorizing Faucher, then Berry at Faucher's instructions, to sign names of absentee landowners to sell their property.

Berry was a high school graduate with about three years of college credit and some law school training and thirty years of business experience. Thompson explained to Berry that if he were criminally involved "we don't talk to anybody." Berry assured Thompson he was completely innocent—Faucher was responsible. He claimed he lacked knowledge or awareness that anything was wrong with the real estate transaction. In short, his claim was lack of mens rea. On several occasions Berry spoke to Thompson and professed his innocence. Based upon these protestations, Thompson concluded Berry was innocent.

Berry sought release from jail for, among other reasons, he was having difficulty with his wife. Thompson testified the deputy district attorney handling the case was reluctant to recommend an OR release unless Berry could convince him, as he had Mr. Thompson, that he was innocent and Faucher was the real culprit. In such circumstance, the deputy district attorney would be willing to reduce bail or recommend an OR.[1] Thompson represented the alternatives to Berry and explained the pitfalls and problems in talking to the district attorney. He told his client that talking to the district attorney was "talking to the enemy."

---

[1] The deputy district attorney did not recall such a discussion.

In this factual context, Thompson permitted the district attorney to interview Berry. Thompson sought to (1) achieve a bail reduction and (2) demonstrate, through cooperation, his client's innocence. What resulted was a detailed and thorough 90-minute tape-recorded interrogation in which Berry admitted: signing various signatures, including that of grantors and notaries on deeds; having Hull open a mail service for receipt of real estate documents using false names; and meeting with two attorneys—one from Mexico—under fictitious names, concerning transfer of large sums of money to Mexico. Berry firmly protested his lack of intent to steal. The reason? He trusted Faucher's representations regarding legal authority provided by a secret group of investors.

Contrary to Berry's expectations, the interviews strengthened the district attorney's resolution to proceed against Berry. However, there was a reduction of the bail and Berry was released from jail.

Thompson advised Berry on several occasions he should not take a polygraph examination if he had anything to hide. However, if everything was as Berry represented, Thompson felt Berry would benefit from a polygraph; he allowed Berry to make the final decision. Berry did take the polygraph examination and the results were unfavorable. At this point Thompson lost faith in his client. Attorney Joseph Milchen, a certified criminal law specialist and a former United States assistant attorney, expressed his opinion that Thompson's conduct was not that which could be reasonably expected of a reasonably competent attorney acting as a diligent advocate, giving these reasons: (1) Berry received no benefit in exchange for the initial interview; (2) Thompson should not have exposed his client to the polygraph without first determining he could pass; and (3) the effect of the interview was to deprive Berry of the opportunity to require the prosecution to meet its burden of proof of facts as to the real estate fraud, depriving him of a meritorious defense—lack of criminal intent.

### Facts—The Trial

There were 12 transactions. On each occasion, a man telephoned a north county real estate office offering to sell vacant lots in North County San Diego. The caller always wanted a quick cash sale and instructed the real estate agent to mail pertinent documents, the listing agreement, title reports and contracts in care of a fictitious attorney at various La Jolla mailing addresses. The real estate agent and the

"seller" never met in person. The purported seller always was unable to provide a telephone number at which he could be reached; signed documents were returned by mail messenger. The true owners of the lots offered for sale had no knowledge that their lots were being offered for sale; they had not signed any documents authorizing a sale. Berry signed the names of many of the true owners and also signed names of fictitious notaries on the documents. Faucher signed others.[2] At Berry's direction, Hull opened three mail service addresses in La Jolla using fictitious names. Berry provided Hull with the necessary cash and provided a list of names of those who might also expect to receive mail at these mail drops. The names given included actual owners of vacant lots.

Hull picked up mail from the mail service and delivered it to Berry. Upon receipt of the first message, Berry said "it is started."

Berry and Faucher met with a Mexican attorney, Gomez, in San Ysidro to discuss investing money in Mexico. They used false names, Clark and Fisher respectively, during this meeting. At Berry's direction, Hull delivered two checks to Gomez in Mexico, a $32,000 check on the Souther transaction and a $37,000 check on the Lang transaction. These checks failed to clear because of forged indorsements. When Gomez later told Hull the checks would not clear because of fraud or forgery, Hull relayed the message to Berry who responded that everything was off.

Berry testified he was duped by Faucher into signing other peoples' names. Five witnesses described Faucher's penchant for the signing of names of others in real estate transactions. A former employer of Faucher had fired him for such activity. Berry had passed the exam for a real estate license and went to work for Faucher parttime. However, Berry did not demonstrate real estate experience and, while there, the company developed economic problems. Faucher told him he needed assistance with some out-of-state investors who would be buying and selling property. Berry said he arranged the mail drops and signed the numerous documents at Faucher's request, believing Faucher had authority to sign the names. After Berry was arrested and released on bail, Faucher, Berry testified, called him to apologize. The jury disbelieved Berry, convicted him on all counts.

---

[2]Prosecution handwriting experts supplied this evidence as to the identity of the writers. The Secretary of State had no record of a notary in California with the name appearing on the documents.

CONTENTIONS

■ Berry contends Thompson's pretrial representation was not that which could be reasonably expected of a reasonably competent attorney acting as a diligent advocate. (*People* v. *Pope* (1979) 23 Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859].) Specifically, he claims Thompson led him on a "blind adventure" of cooperation with the prosecutor. After hearing evidence on the issue, the trial court generalized to the effect there had in fact been an "attorney malfunction"[3] but denied Berry's pretrial motion to dismiss, reasoning that at best Berry would be entitled to a new trial—but the case had not yet started; the entire matter was therefore "moot."

On appeal, Berry contends Attorney Thompson's ineffective assistance, bad advice pretrial, produced damaging admissions, leads to witnesses and disclosures of his defense and thereby impaired his ability to defend the action at trial. He argues Attorney Thompson's representation cost him a defense: the right to remain silent and put the prosecution to its proof. He asserts that dismissal is the only applicable remedy for the alleged deprivation of assistance of adequate counsel.

DISCUSSION

I

■ Under the Sixth Amendment to the United States Constitution, a defendant is entitled to have assistance of counsel for his defense and that right accrues as soon as the adversary proceedings have begun. (*Massiah* v. *United States* (1964) 377 U.S. 201, 204-206 [12 L.Ed.2d 246, 249-250, 84 S.Ct. 1199].) ■ A defendant has rights under the Fifth Amendment against self-incrimination. Questioning of a suspect must cease if he "indicates in any manner and at any stage of the process that he wishes to consult with an attorney . . . ." (*Miranda* v. *Arizona* (1966) 384 U.S. 436, 444-445 [16 L.Ed.2d 694, 706-707, 86 S.Ct. 1602, 10 A.L.R.3d 974].) The product of an interrogation can

---

[3]The judge's conclusion on this precise issue is not as clear as Berry's appellate counsel sees it. Said the judge, ". . . *if* there was legal malpractice or ineffective representation by Mr. Thompson, . . . it could not constitute the basis for a motion to dismiss. . . ." Moreover, Thompson had not even been told "what the motion is about." In fairness, Thompson should have at least been afforded fundamental due process and should have been given the opportunity to review his own records of the case before testifying.

certainly affect the entire trial. (*Hamilton v. Alabama* (1961) 368 U.S. 52, 54 [7 L.Ed.2d 114, 116, 82 S.Ct. 157].)

The California Supreme Court has pointed out that "a substantial portion of the obligation counsel owes is not directly connected with the trial but involves investigation and advice at pretrial and posttrial stages." (*People* v. *Pope, supra*, 23 Cal.3d 412, 423.) ▉ To prove ineffective assistance of counsel, an accused must establish that the attorney "*failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.*" (*Id.*, p. 425.) And that "right is denied if trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases." (*Id.*, p. 424.) Moreover, diligent counsel have "a '"duty to investigate carefully all defenses of fact and of law that may be available to the defendant"'" (*id.*, at p. 425) and "'[c]ounsel should promptly advise his client of his rights and take all actions necessary to preserve them . . . .'" (*Ibid.*)

▉ Attorney Thompson's advice, strategy, is bottomed on his reliance upon Berry's continued protestation of innocence. Had Berry passed the polygraph test, the district attorney admits it would have been difficult to prosecute him. Had Berry been telling Thompson the truth concerning his lack of mens rea, then certainly his information relayed to the district attorney could have resulted in a dismissal or substantially reduced charges. Here Thompson had examined the prosecution's evidence in part and had interviewed his client at length and presented the client with the options to be taken.

In multiparty criminal proceedings, competent defense counsel may consider at a very early stage of the processes—many times before an indictment or information is forthcoming—the choice of cooperation with the prosecution in view of obtaining leniency or dismissal or the alternative of stonewalling—fighting the charges every inch of the way even to the court of last resort. If the cooperation route is chosen, "singing"—talking to the prosecution—is commonly involved. This process may involve a giving of something of value; admission of possible guilt on the part of the defendant, offers of evidence to aid in establishing the guilt of a codefendant. To argue—as does appellate defense counsel here—that only after a quid pro quo is received, shall the client "talk" is to demonstrate an unfamiliarity with the nature of prosecutors. To

expect any offer of dismissal, leniency, etc. *before* the prosecutor makes an appraisal of the evidence tendered is to be unrealistic.

Berry contended he was innocent—based on lack of mens rea. He had convinced Thompson of his innocence in face of many admitted acts pointing to his guilt. Further, he was most willing to load the guilt on the back of his codefendant. The timing of such an approach to the district attorney—if it was to have any value—was critical, for the first tattler to the district attorney's office may be the first with a claim on leniency. Here *both* defendants engaged in this race to disclaim guilt and shift blame. While Berry was first in time, he apparently had no substance with which to bargain. To hold in such circumstances that a failure to complete all discovery of prosecution materials before this approach is attempted is to almost assure its failure as a strategy to gain a favor. Delay may foreclose opportunity.

In assessing counsel incompetency, we must also add Berry's present concession that his information "properly" conveyed could sometime "result in dismissal or substantially reduced charges." Berry argues (without fact base) that Attorney Thompson failed to communicate and negotiate the information "properly." It can be speculated with equal or greater vigor that Berry's inability to "properly" convince the deputy district attorney of his veracity caused the lack of an offer of leniency and dismissal. As is apparent from the evidentiary course of the trial, Berry had no facts with which to bargain. He gave nothing to the deputy district attorney. Contrary to the trial court's generalization, we view the decision to cooperate or not to cooperate at this early stage of the proceeding as a tactical choice made within the spectrum of reasonable competence of a trial attorney.

II

With respect to the contention of lawyer ineffectiveness due to a failure to require the client to take and pass a prelie detector test before submitting to the prosecutor's polygraph machine, we note these salient factors: Berry admits the lie detector "has demonstrated an unfortunate capacity to record the psychological reactions of truthful subjects as deception responses, and an anomalous inability to mirror the falsehoods of unresponsive subjects or those knowledgeable of the various ways to beat the machine." Highleyman *The Deceptive Certainty of the "Lie Detector"* (1958) 10 Hastings L. J. 47, 62. Furthermore the generally accepted premise is that the results of the lie detector tests themselves

are not considered reliable enough to have probative value. (*People* v. *Carter* (1957) 48 Cal.2d 737, 759 [312 P.2d 665]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Cooper* (1979) 95 Cal.App.3d 844, 850 [157 Cal.Rptr. 348]; *Aengst* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 275, 282 [167 Cal.Rptr. 796].)

In *People* v. *Adams* (1975) 53 Cal.App.3d 109 [125 Cal.Rptr. 518], the defendant took a "unilateral" test from a polygraph of his own choosing before submitting to the opposition machine. Said the court: "We believe this seriously diminished the reliability of the test and rendered inadmissible the evidence it was designed to produce." (*Id.*, at pp. 115-116) and "the more times a person is tested, the less reliable are the test results." (*Id.*, at p. 118; fn. omitted.) In order to second such views, we need not seek out psychiatric opinions but need only consult our common knowledge, common experience with respect to the vagaries of the human mind and emotions. Feelings of guilt or innocence arise from a thousand undetermined and deepseated (subconscious?) sources. The effect of a "friendly" or "hostile" polygrapher, the confidence that arises from the fact that the test results—whatever they may be—will not be used against the subject, the fear of the machine itself, each and all have an effect on the sweat glands, blood pressure and rate of breathing and the reliability of the polygraph test.

Experts opine that among the factors that can adversely affect the reliability of the polygraph test are the emotional upset of the subject, fatigue, drunkenness, drugs, bad physical or emotional condition, high blood pressure, low blood pressure, hardening of the arteries, obesity, feeblemindedness, amnesia, a psychotic condition, being a pathologic liar, lack of fear or concern at being caught in a lie, surreptitious nervous simulation, use of antiperspirants, hypnosis, extraneous noise or abnormal temperatures.

For this court to conclude that Attorney Thompson was guilty of lawyer incompetence for a failure to require Berry to pass the pretest lie detector test is, if some experts are correct, to cast doubt on or diminish the reliability of the second test. If Attorney Thompson (and appellate counsel) were knowledgeable of the state of the polygraph art, each would be aware that the results of the "friendly" and the "unfriendly" polygraph tests may well be different. Passing (or failure) on the first test is no assurance against a contrary result on a later test.

An assertion of attorney incompetence to be successful needs some firm evidentiary base. We do not find it here. The failure to require Berry to submit to a pretest friendly polygrapher does not demonstrate lawyer incompetence.

We are not prepared, based on this record, to find a failure of effective assistance of counsel.

## III

If we accept, arguendo, Berry's characterization of Thompson's efforts and concede that the first prong of the *Pope* test was met, yet another barrier precludes reversal of his conviction.

■ Berry generalizes, argues he gave up this meritorious defense: "the right to remain silent and to put the prosecution to his proof." All that is wrong with this contention is that it is not supported by facts. The prosecution was put to its proof—434 pages of testimony plus a multitude of documents to establish Berry's guilt. The statements obtained from Berry pretrial were not in fact used at trial. Berry's "damaging forgery admissions" were not used. Proof of Berry's forged signatures, grantor and notary, was made not from Berry's admissions pretrial but by an expert on the questioned documents. The fact of a polygraph examination or its result were never revealed to the jury. Thus Berry's choice to testify cannot be seen a compelled act forced by earlier discussions with the prosecution.

The state of the evidence at the close of the People's case did not depend for proof of any critical fact upon Berry's pretrial discussions; rather the People's independent evidence invited, almost compelled response. In such circumstance, the trial attorney cannot be faulted for putting his client on the stand. Berry's protestations of innocence were based upon (1) a lack of mens rea and (2) that some other defendant possessed the guilty intent. This was his defense posture both before and during trial. He was not believed pretrial by the prosecutor and—from the verdicts—not by the jury.

Berry points to none and we can find no meritorious defense that was lost or precluded by the criticized pretrial discussion or the lie detector test given.

In substance Berry seeks reversal of his conviction after an eminently fair trial, without a showing of any prejudice. Unless irregularities in the pretrial process are "jurisdictional in the fundamental sense" (*People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941]), they should be reviewed under the appropriate standard of prejudicial error and should require reversal *only* if the defendant can show he was deprived of a fair trial or otherwise suffered prejudice as a result of the error pretrial. (*Ibid.*; *People* v. *Chavez* (1980) 26 Cal.3d 334, 344-348 [161 Cal.Rptr. 762, 605 P.2d 401].) Berry cites us to no facts showing prejudice. The "per se" rule of reversible error is not applicable here.

Judgment affirmed.

Cologne, Acting P. J., and Wiener, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 1, 1981.

The United States Supreme Court denied a petition for writ of certiorari on November 2, 1981.