[L.A. No. 32051. June 19, 1986.]

LONG BEACH CITY EMPLOYEES ASSOCIATION,
Plaintiff and Appellant, v.
CITY OF LONG BEACH et al., Defendants and Respondents.

**COUNSEL**

Helena S. Wise and Geffner & Satzman for Plaintiff and Appellant.

Laurence Gold, Stephen P. Berzon, Marsha S. Berzon, Michael Rubin and Altshuler & Berzon as Amici Curiae on behalf of Plaintiff and Appellant.

Robert W. Parkin, City Attorney, and Blanche Deight, Deputy City Attorney, for Defendants and Respondents.

George Agnost, City Attorney (San Francisco), Mary J. Shea, Deputy City Attorney, James K. Hahn, City Attorney (Los Angeles), Frederick N. Merkin, Senior Assistant City Attorney, and Robert Cramer, Assistant City Attorney, as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**BROUSSARD, J.**—Appellant Long Beach City Employees Association challenges the constitutionality of a legislative scheme under which certain

public employees in California may be compelled to undergo polygraph examinations as a condition of employment. Labor Code section 432.2 provides that no employer may require any employee or applicant for employment to submit to a polygraph examination as a condition of employment, but contains an exception for all federal, state and local government employers.[1] A separate statute, Government Code section 3307, provides that no "public safety officer" shall be compelled to submit to a polygraph examination against his will.[2] Thus, the only employees in California who *can* be subjected to compulsory polygraph examinations are public employees who are not "public safety officers."

Long Beach City Employees Association (hereinafter CEA) brings this lawsuit on behalf of a group of public employees who assert that orders by defendant City of Long Beach (hereinafter City) to submit to polygraph examinations violate their rights of privacy (Cal. Const., art. I, § 1) and equal protection. (Cal. Const., art. I, § 7; U.S. Const., 14th Amend., § 1.) CEA sues to enjoin such examinations in the future.

## I. *Facts*

■ ■■■ CEA is the exclusive representative under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.) of City employees in a variety of bargaining units, including certain employees of the Long Beach Marine Bureau (hereinafter Bureau).[3] The Bureau is a subdivision of the Long Beach Tidelands Agency.

---

[1]Labor Code section 432.2 provides: "(a) No employer shall demand or require any applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment. The prohibition of this section does not apply to the federal government or any agency thereof or the state government or any agency or local subdivision thereof, including, but not limited to, counties, cities and counties, cities, districts, authorities, and agencies.

"(b) No employer shall request any person to take such a test, without first advising the person in writing at the time the test is to be administered of the rights guaranteed by this section."

[2]Government Code section 3307 provides: "No public safety officer shall be compelled to submit to a polygraph examination against his will. No disciplinary action or other recrimination shall be taken against a public safety officer refusing to submit to a polygraph examination, nor shall any comment be entered anywhere in the investigator's notes or anywhere else that the public safety officer refused to take a polygraph examination, nor shall any testimony or evidence be admissible at a subsequent hearing, trial, or proceeding, judicial or administrative, to the effect that the public safety officer refused to take a polygraph examination."

[3]Defendants contend that CEA has no standing to assert the privacy rights of the employees it represents. We reject this contention. The instant lawsuit comes well within the scope of representation under the Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.). (See

In the summer of 1982, the Bureau suspected that money was being stolen from its boat launch ramp machines. Seven hundred dollars of marked money was placed in the machines during a five-day period in July, and $218 was subsequently found missing. Since there was no evidence of tampering or forced entry, the Bureau suspected that a person or persons having access to keys to the machines committed the theft. A criminal investigation was initiated during which numerous Bureau employees were interrogated by the police. The criminal investigation was discontinued for lack of sufficient evidence. The Bureau then launched an administrative investigation and beginning about September 7, 1982, 26 employees received orders to undergo polygraph examinations.

Sworn declarations of the polygraph examiner, city employees and CEA representatives reveal the following events. Initially all of the employees indicated that they would refuse to submit to a polygraph examination and they contacted CEA to intervene on their behalf. On October 26, 1982, CEA filed a complaint for a temporary restraining order and injunctive relief to prevent administration of the polygraph examinations. CEA's requests were denied on October 26, 1982, and January 10, 1983, respectively. During this period most of the employees submitted to polygraph examinations under threat of possible termination from employment if they refused.

Numerous instances of difficult or uncooperative behavior occurred, however. One employee who volunteered for early testing subsequently refused to complete the test when the examiner attempted to attach physical instruments to his body. This same employee became very upset when he was allegedly questioned about his sexual background. (The examiner, however, denied having asked any questions concerning his sexual background or preferences.) A second employee insisted on stating on the record that he submitted to the test only under protest and as a result of duress. A third employee's test was inconclusive because of extreme nervousness and a fourth because he engaged in controlled breathing of a type consistent with a deliberate attempt to defeat the examination.

The entire incident created an atmosphere of distrust and antagonism between the Bureau and its employees. The director of the Bureau, in a meeting with employees on this matter in August 1982, allegedly called them "a

*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 284 [32 Cal.Rptr. 830, 384 P.2d 158]; *California Sch. Employees Assn.* v. *Willits Unified Sch. Dist.* (1966) 243 Cal.App.2d 776, 780 [52 Cal.Rptr. 765]; see also *Seattle Police Officers' Guild* v. *City of Seattle* (1972) 80 Wn.2d 307 [494 P.2d 485, 486].) The fact that personal privacy rights are involved is no bar to a representational suit of this kind. (See *Chico Fem. Women's Hlth. Cr.* v. *Butte Glenn Med. S.* (E.D.Cal. 1983) 557 F.Supp. 1190, 1200 [applying California law].)

bunch of thieves." City policy officials recommended to City management that in the future all employees with access to public money be given polygraph tests every six months. For their part, the employees alleged feeling personally accused and as if put into an "electric chair." A CEA observer at the exams accused the examiner of prejudging the guilt of his subjects from police reports pinpointing certain individuals as probably guilty.

One employee ultimately refused to take a polygraph examination. He had been employed with the Bureau for 15 years and was then president of the Harbor Patrol Officers Association. He and others questioned the Bureau as to why only certain of the employees with access to machine keys had been selected for examination. Although he had not initially been ordered to take an examination, he subsequently received an order to appear for a polygraph examination. As of the date of the hearing on the preliminary injunction he continued to refuse to take the examination. All other employees of the Bureau who were ordered to submit to polygraph examinations have done so.

## II. *Polygraph Testing and the Right of Privacy*

■ The first question we must address is whether involuntary polygraph examinations impinge on an employee's right of privacy. In November 1972, the voters of California amended article I, section 1 of our Constitution to include among the inalienable rights of all people the right of "privacy."[4] In *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], we stated that the importance of *mental* privacy in the adoption of the amendment is evident from the election ballot argument presented to the voters.[5] The argument stated: "'The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, *our thoughts, our emotions, our expressions, our personalities,* our freedom of communion and our freedom to associate with the people we choose.' . . . 'This right should be abridged only when there is a compelling public need. . . .'" (*Id.,* at pp. 774-775, italics added.)

[4] Article I, section 1 of the California Constitution was reworded by constitutional amendment in 1974 and now provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy.*" (Italics added.)

[5] Election ballot arguments have long been used as an aid in construing constitutional amendments adopted via the initiative process. (See, e.g., *White* v. *Davis, supra,* 13 Cal.3d at p. 775, fn. 11 (and cases cited therein); *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 267, fn. 7 [186 Cal.Rptr. 30, 651 P.2d 274] (Bird, C. J., dis.).) And as we stated in *White* v. *Davis, supra,* the election ballot argument is the only "legislative history" of the privacy right amendment available to us. (*Id.,* at p. 775.)

If there is a quintessential zone of human privacy it is the mind. Our ability to exclude others from our mental processes is intrinsic to the human personality.[6] In their seminal article on the right to privacy, Warren and Brandeis stated: "The common law secures to each individual the right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." (Warren & Brandeis, *supra*, at p. 198.) Seventy-five years later, a United States Senate committee investigating employee psychological testing defined privacy in much the same terms.[7]

A polygraph examination is specifically designed to overcome this privacy by compelling communication of "thoughts, sentiments, and emotions" which the examinee may have chosen not to communicate.[8] The standard polygraph test is far more intrusive than a series of questions related directly to the employee's job performance or knowledge of the crimes under investigation. When an employee first arrives for an examination, he or she is typically seated in a reception area for several minutes where, unbeknownst to the employee, observation has already begun. During this period the employee's behavior is observed to evaluate his or her attitude toward the examination, whether hostile or cooperative. This evaluation becomes part of the guilt determination.[9]

---

[6]See Hermann, *Privacy, The Prospective Employee, and Employment Testing: The Need to Restrict Polygraph and Personality Testing* (1971) 47 Wash. L.Rev. 73, 127-128 (hereinafter Hermann, *Polygraph and Personality Testing*); Warren and Brandeis, *The Right to Privacy* (1890) 4 Harv. L.Rev. 193, 198, 207.

[7]Privacy was defined as "the right of the individual to decide for himself, with only extraordinary exceptions in the interest of the whole society, when and under what conditions his thoughts, speech, and acts should be revealed to others." (Hearings on Psychological Testing Procedures and the Rights of Federal Employees Before the Subcom. on Constitutional Rights of the Senate Com. on the Judiciary, 89th Cong., 1st Sess., at p. 2 (1965).)

[8]The privacy implications of polygraph testing as a condition of employment have been discussed by numerous commentators. (See, e.g., Note, *Lie Detectors in Private Employment: A Proposal for Balancing Interests* (1965) 33 Geo. Wash. L.Rev. 932; Burkey, *Privacy, Property and the Polygraph* (1967) 18 Lab. L.J. 79; Fallick, *Lie Detectors and the Right to Privacy* (1968) 40 N.Y.St. Bar J. 102; Hermann, *Polygraph and Personality Testing, supra*, 47 Wash. L.Rev. 73; Markson, *A Reexamination of the Role of Lie Detectors in Labor Relations* (1971) 22 Lab. L.J. 394; Comment, *Privacy: The Polygraph in Employment* (1976) 30 Ark. L.Rev. 35; Craver, *The Inquisitorial Process in Private Employment* (1977) 63 Cornell L.Rev. 1; Comment, *Regulation of Polygraph Testing in the Employment Context: Suggested Statutory Control on Test Use and Examiner Competence* (1981) 15 U.C. Davis L.Rev. 113 [hereinafter Comment, *Regulation of Polygraph Testing*]; Gardner, *Wiretapping the Mind: A Call to Regulate Truth Verification in Employment* (1984) 21 San Diego L.Rev. 295 [hereinafter Gardner, *Wiretapping the Mind*].)

[9]The subject is typically given "prepared reading matter which describes the lie detector as a virtually unerring instrument. The initial hypothesis, guilty or not-guilty, is based upon the receptionist's report of reactions to this literature. If the subject seems to be hostile, annoyed, or unsympathetic, guilt is indicated. If the subject is able to show enthusiasm for

A pretest interview is then administered by the polygraph examiner to determine whether there are "any emotional or psychological factors which would adversely affect the reliability of test results." (Comment, *Privacy: The Polygraph in Employment, supra,* at p. 36.) The type of questions that must be asked to make this determination are highly personal and are unrelated to the employee's official duties. For instance, the examiner must find out about any physiological abnormalities such as excessively high or low blood pressure, heart or respiratory diseases, and about mental abnormalities such as retardation, psychoses and neuroses. (Hermann, *Polygraph and Personality Testing, supra,* at p. 80, fn. 31.)

In the instant case, the following questions appeared on the pretest interview transcript of a Bureau employee: "Ever been arrested for any reason? . . . Any history of heart trouble or epilepsy? . . . Under the care of a doctor now for any reason? . . . Ever been treated by or consulted a psychiatrist for any reason? . . . Have you ever experimented with any type of drugs—reds, whites, LSD, heroin, or cocaine? . . . Have you ever smoked marijuana in your life? . . . When was the last time?"

Physical instruments are then attached to the examinee's body: "[T]he subject is seated in a chair specially constructed to permit the attachment of the various measuring devices: the pneumograph tube is tied to his chest, the blood-pressure cuff is wrapped round his upper arm, and a set of electrodes is attached to his hands. The subject looks straight ahead. The examiner is seated to his side behind a desk containing a set of controls which the subject cannot see. These instruments begin a continuous graphic recording when the examination commences." (Skolnick, *Lie Detection, supra,* at p. 697, fn. omitted.)[10]

---

the machine, he will have established himself, *prima facie,* as innocent." (Skolnick, *Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection* (1961) 70 Yale L.J. 694, 704-705 [hereinafter Skolnick, *Lie Detection*].)

[10]Technological and scientific advances have made possible more sophisticated polygraph devices than the common one described in the text. "During the late 1950's and early 1960's, the federal government devised a lie detection seat that can be used without the knowledge of the individual being examined. The device consists of 'a seemingly "normal" chair which has equipment built into it to register body heat, changes in limb volume, and nervous movements. Hidden cameras are also used in such covert polygraphing to measure changes in eye-pupil size as an indicator of stress during the interview.' One firm has developed a Psychological Stress Evaluator, which can purportedly determine veracity through the evaluation of voice samples. [¶] The future may witness sensing devices implanted in the human body capable of transmitting data on psychological and physiological changes. Such information could easily be applied to evaluate the veracity of statements made during an employment investigatory interview. Scientists may ultimately develop a machine capable of reading thoughts through the interpretation of cerebral impulses. Such technological advances could have a profound effect upon employees, and could give rise to exceedingly complex policy conflicts." (Craver, *The Inquisitorial Process in Private Em-*

The test questions that are then administered include a "control question" calculated to cause the subject to lie. The purpose is to provide the examiner with a recorded example of deception that can be used to judge the subject's answers to other questions. (See Hermann, *Polygraph and Personality Testing, supra,* at p. 81; Skolnick, *supra,* at pp. 697-698.) Two leading authorities on polygraphy have described the control question as "a question about an act of wrongdoing of the same general nature as the main incident under investigation, and about which the subject in all probability will lie or to which his answer will be of dubious validity in his own mind." (Reid & Inbau, Truth and Deception (1966) at p. 19 [cited in Hermann, *supra,* at p. 81].)

A typical control question is, "Did you ever steal anything?" If the answer given is "no," the examiner is then directed to question the subject concerning attempted thefts and thefts committed during childhood. (*Id.,* at p. 20.) It has been stated that "[t]he polygraph technique forces an individual to incriminate himself and confess to past actions which are not pertinent to the current investigation. He must dredge up his past so he can approach the polygraph machine with an untroubled soul. The polygraph operator and his supervisors then decide whether to refer derogatory information to other agencies or officials." (Use of the Polygraph as "Lie Detector" by the Federal Government, H.R. Rep. No. 198, 89th Cong., 1st Sess., pp. 19-20 (1965).) Where polygraph testing is used as a preemployment screening device, "fishing expeditions" and shockingly intrusive questions have been reported.[11]

The intrusiveness of polygraph questions on private matters is exacerbated by three factors that make the process fundamentally different from verbal interrogation. First, "[t]he polygraph merely records general emotional

---

ployment, *supra,* 63 Cornell L.Rev. 1, 30 (fns. omitted); see also Gardner, *Wiretapping the Mind, supra,* at pp. 295-296, fn. 3). All of these methods of thought collection would implicate the same core privacy interests as does the lie detection process detailed here.

[11]One polygraph technician's manual contained the following questions for use in preemployment polygraph tests, most including detailed follow-up questions: "Have you had any major operations within the past ten years? . . . Have you ever suffered a nervous breakdown? . . . Have you ever filed for, or collected workmen's compensation insurance from an on the job injury? . . . Have you ever had an automobile accident while you were driving? . . . Are you now or have you ever been a communist sympathizer? . . . Have you written any bad or insf [*sic*] checks in the past three years?" (Ferguson, The Polygraph in Private Industry (1966) at pp. 133-141 [cited in Hermann, *Polygraph and Personality Testing, supra,* at pp. 83-84, fns. 42-43].) A prospective firefighter who submitted to a polygraph examination was reportedly asked: "Have you had sex with men? Have you had sex with animals? Have you touched a child with sexual intent? How often do you masturbate? Do you cheat on your wife?" (Gardner, *Wiretapping the Mind, supra,* at p. 299. See also Comment, *Regulation of Polygraph Testing, supra,* at pp. 117-118 and fn. 21.)

arousal. It cannot distinguish anxiety or indignation from guilt." (Meyer, *Do Lie Detectors Lie?* (June 1982) Science '82, 24, 26.) Thus, repressed beliefs, guilt feelings and fantasized events—not just actual events—can be discovered by a polygraph. (Hermann, *Polygraph and Personality Testing, supra,* at pp. 84-85.) Second, an employee who is asked an embarrassing personal question may be reluctant to refuse to answer it for fear of appearing dishonest. (Comment, *Regulation of Polygraph Testing, supra,* at p. 118, fn. 21.) The coercive circumstances of a polygraph test thus compel employees to divulge private information for fear of losing their jobs. Finally, even if an employee chooses not to *verbally* answer a question on a personal matter, the polygraph will record his or her *psychological* response in any event. "Intrusion occurs because the polygraph device continuously records the monitored physiological functions. Consequently, an examinee cannot prevent a response to a test question even by remaining silent." (*Id.,* at p. 117; Gardner, *Wiretapping the Mind, supra,* at p. 305.)

The City contends that privacy concerns are not implicated by the polygraph examinations at issue here because the questions asked of its employees related directly and narrowly to performance of their official duties. The City is correct that a public employee may be required—on pain of dismissal—to answer questions "specifically, directly, and narrowly relating to the performance of his official duties." (*Gardner* v. *Broderick* (1968) 392 U.S. 273, 278 [20 L.Ed.2d 1082, 1086, 88 S.Ct. 1913]; *Szmaciarz* v. *State Personnel Bd.* (1978) 79 Cal.App.3d 904, 918 [145 Cal.Rptr. 396].) We cannot agree, however, that all of the questions asked of employees here can be so characterized. (See *ante,* p. 945.) If the City had demanded only that its employees answer questions pertaining directly to performance of their duties upon pain of dismissal, without using the intrusive intermediary of polygraph testing, then this case would be entirely different. (See *Sanitation Men Asso.* v. *Commissioner* (1968) 392 U.S. 280, 284-285 [20 L.Ed.2d 1089, 1092-1093, 88 S.Ct. 1917].) Indeed, we agree with those courts that have suggested that the permissible scope of questioning under *Gardner* is necessarily exceeded by control and pretest questions required in connection with a polygraph examination. (See *Oberg* v. *City of Billings* (Mont. 1983) 674 P.2d 494, 498; *Farmer* v. *City of Fort Lauderdale* (Fla. 1983) 427 So.2d 187, 188, cert. den. *sub nom. City of Fort Lauderdale* v. *Farmer* 464 U.S. 816 [78 L.Ed.2d 86, 104 S.Ct. 74] [citing with approval *State Dept. of Highway Safety, etc.* v. *Zimmer* (Fla.App. 1981) 398 So.2d 463, 468 [15 A.L.R.4th 1197] (Anstead, J., dis.)]; see also *Seattle Police Officers' Guild* v. *City of Seattle, supra,* 494 P.2d at p. 496 (Rosellini, J., dis.).)

Moreover, the City focuses solely on the questions asked of employees and ignores the inherently intrusive nature of a polygraph examination—

which involves the involuntary communication of thoughts—over and above simple verbal interrogation. While the pretest questions asked here clearly exceed the limited exception established in *Gardner,* we need not discuss them with particularity because we find that polygraph examinations inherently intrude upon the constitutionally protected zone of individual privacy.[12] The coercive collection of mental thoughts, conditions and emotions must be justified by a compelling governmental interest. This is true whether or not pretest questions exceed the *Gardner* exception and whether or not available technology involves a physical hookup to the lie detector.

### III. *Equal Protection Analysis*

CEA contends that the legislative scheme that protects all private employees and all "public safety officers" from involuntary polygraph testing denies equal protection of the law to public employees who remain subject to involuntary polygraph testing.

A legislative classification rationally related to achieving a legitimate state purpose will normally be deemed constitutional unless it infringes upon a fundamental interest or creates a suspect classification. (See, e.g., *Serrano* v. *Priest* (1976) 18 Cal.3d 728, 767-768 [135 Cal.Rptr. 345, 557 P.2d 929], cert. den. 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951].) Since we conclude here that polygraph examinations impinge on the fundamental right of privacy, the burden is on the City to demonstrate that the classifications drawn by Labor Code section 432.2 and Government Code section 3307 are justified by a compelling governmental interest and that the distinctions drawn are necessary to further that purpose. (*Ibid.*; *White* v. *Davis, supra,* 13 Cal.3d at p. 776.)

### A. *The Statutory Scheme Sets Up a Dual Classification.*

We begin by defining the statutory classification of employees with regard to their immunity from involuntary polygraph testing. Labor Code section 432.2, enacted in 1963, provides in part: "No employer shall demand or

---

[12]Since CEA relies primarily on its contention that Bureau employees were denied equal protection, we need not decide at this juncture whether their right of privacy was improperly violated irrespective of the legislative classifications that exempt private sector employees and all "public safety officers" from involuntary polygraph testing. To decide the latter question, we would inquire whether the City had demonstrated a compelling governmental interest in administering the polygraph examinations to these employees and whether this interest could be accomplished by less intrusive means. (See *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 268 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *White* v. *Davis, supra,* 13 Cal.3d at p. 775; *City of Santa Barbara* v. *Adamson* (1980) 27 Cal.3d 123, 131-133 [164 Cal.Rptr. 539, 610 P.2d 436, 12 A.L.R.4th 219].)

require an applicant for employment or prospective employment or any employee to submit to or take a polygraph, lie detector or similar test or examination as a condition of employment or continued employment." The section goes on to state, however, that it does not apply to public employers.[13]

In enacting Labor Code section 432.2, the Legislature evinced a belief in the unreliability of polygraph testing and the undesirability of its use as a condition of employment.[14] The Legislature stated as its reasons for adopting the statute that polygraph testing (1) creates suspense and distrust between employers and employees; and (2) is not entirely accurate and may result in false findings when used by inexperienced persons. (Stats. 1963, ch. 1881, Assem. Bill No. 927, p. 3866.)[15]

---

[13]See *ante*, footnote 1 for complete text of Labor Code section 432.2.

Other states have also enacted legislation restricting the use of polygraph testing in employment. (See, e.g., Alaska Stat., § 23.10.037 (1972); Conn. Gen. Stat., § 31-51g (1977); Del. Code Ann., tit. 19, § 704 (1979); Hawaii Rev. Stat., §§ 378-21 to 378-22 (1976); Idaho Code, §§ 44-903 to 44-904 (1977); Me. Rev. Stat. Ann., tit. 32, § 7166 (Cum. Supp. 1985); Md. Ann. Code, art. 100, § 95 (1979); Mass. Gen. Laws Ann., ch. 149, § 19B (West. Cum. Supp. 1985); Mich. Comp. Laws, § 37.2205, subd. (a) (Supp. 1985); Mont. Rev. Codes Ann., § 39-2-304 (Cum. Supp. 1984); N.J. Stat. Ann., § 2C:40A-1 (West 1985); Ore. Rev. Stat., §§ 659.225-659.227 (1979); 18 Pa. Cons. Stat. Ann., § 7321 (Purdon 1973); R.I. Gen. Laws, §§ 28.6.1-1 to 28.6.1-2 (1979); Wash. Rev. Code, §§ 49.44.120-49.44.130 (Cum. Supp. 1985).)

[14]The unreliability of polygraph examinations has led to their inadmissibility in judicial and administrative proceedings in California, as in other jurisdictions. (*People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577], cert. den. *sub nom., Jones* v. *California* (1960) 361 U.S. 926 [4 L.Ed.2d 350, 80 S.Ct. 364]; *Aengst* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 275, 282-283 [167 Cal.Rptr. 796]; 32 C.J.S. § 588(4); 22A C.J.S. § 645(2).) The courts in some jurisdictions have further held that because of the polygraph's unreliability, an employee's refusal to submit to a polygraph test cannot be used as a basis for dismissal. (See *In re Fairbanks* (Iowa 1980) 287 N.W.2d 579, 582; *Stape* v. *Civil Service Com. of City of Philadelphia* (1961) 404 Pa. 354 [172 A.2d 161, 164]; *Molino* v. *Board of Pub. Safe. of City of Torrington* (1966) 154 Conn. 368 [225 A.2d 805, 809]; *Kraske* v. *City of Rockford* (1983) 96 Ill.2d 298 [450 N.E.2d 314, 320]; *Farmer* v. *City of Fort Lauderdale, supra,* 427 So.2d at pp. 190-191; *Douthitt* v. *Ky. Unempl. Ins. Comn.* (Ky.App. 1984) 676 S.W.2d 472, 474-475.) Section 432.2 has also been described as suggesting a "basic legislative disapproval of employer-administered polygraph tests." (43 Ops.Cal.Atty.Gen. 25, 27 (1964).)

[15]Polygraph tests have been challenged as unreliable for four main reasons. First, many normal emotional states (as well as abnormal physical and mental states) can affect the results of a polygraph test, rendering false positives and false negatives. (See Skolnick, *Lie Detection, supra,* at p. 705; Hermann, *Polygraph and Personality Testing, supra,* at p. 80, fn. 31; Comment, *Privacy: The Polygraph in Employment, supra,* at pp. 35-36; Burkey, *Privacy, Property and the Polygraph, supra,* at p. 80.) Second, the scientific assumptions underlying polygraph testing—that deception causes conflict and anxiety, and that these emotions in turn cause certain physiological changes—have been questioned and not found uniformly true. (See Skolnick, *supra,* at pp. 700-703; Markson, *A Reexamination of the Role of Lie Detectors in Labor Relations, supra,* at p. 396; Burkey, *supra,* at pp. 80-81.) Third, polygraph testing relies heavily on the subjective interpretive skills of the examiner, who is

In 1976, the Legislature partially rectified the inequality between public and private employees by enacting the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.). This act provides that "[n]o public safety officer shall be compelled to submit to a polygraph examination against his will." (Gov. Code, § 3307.)[16] The legislative purposes behind the act were set out in section 3301, which states in relevant part: "The Legislature . . . finds and declares that effective law enforcement depends upon the maintenance of stable employer-employee relations, between public safety employees and their employers." Other public employees remained subject to compulsory polygraph testing under the terms of section 432.2.

The legislative classification is therefore dual in character. Section 432.2 makes a general classification between public and private employees by protecting only the latter group from compulsory polygraph testing. And section 3307 makes a subclassification between "public safety officers," who cannot be compelled to take polygraph examinations, and all other public employees, who are not so protected.

B. *The Public Employee's Privacy Interest.*

■ In urging that we apply a rational basis test, the City argues that public employees cannot claim that their right of privacy as citizens protects them from compulsory polygraph testing, because there is no constitutional right or fundamental interest in continued public employment. (See *Bagley* v. *Washington Township Hosp. Dist.* (1966) 65 Cal.2d 499, 503 [55 Cal.Rptr. 401, 421 P.2d 409], and *Civil Service Assn.* v. *Civil Service Com.* (1983) 139 Cal.App.3d 449 [188 Cal.Rptr. 806].) Therefore, it asserts, strict judicial scrutiny is not applicable and the City can require its employees to choose between continued employment and the exercise of their right

the real "lie detector." (See Hermann, *supra,* at p. 76; Skolnick, *supra,* at pp. 695, 707; Gardner, *Wiretapping the Mind, supra,* at pp. 304-305.) However, polygraph examiners typically receive only a short training course and have little background in the physiological or psychological sciences. (See Comment, *Regulation of Polygraph Testing, supra,* at pp. 114-115; Skolnick, *supra,* at p. 707; Gardner, *ibid.*) Moreover, no account is taken of the examiner's own attitudes and biases as they affect his or her assessment of the subject's credibility. (See Skolnick, *supra,* at pp. 711-714; *Seattle Police Officers' Guild* v. *City of Seattle, supra,* 494 P.2d at p. 496 (Rossellini, J., dis.).) Finally, it has been noted that polygraphy is a commercial industry. Its proponents have a large stake in producing results for their clients and in promoting a "myth of infallibility." (See, Burkey, *supra,* at p. 80; Meyer, *Do Lie Detectors Lie?, supra,* Science '82, 24, 26.) The commercial nature of the endeavor therefore tends to undermine proponents' claims concerning the reliability of the polygraph technique. (See Meyer, *ibid.*; *Seattle Police Officers' Guild* v. *City of Seattle, ibid.*)

[16]See *ante,* footnote 2 for complete text of Government Code section 3307.

of privacy. The City relies on *Civil Service Assn.*, *supra*, and its admonition that "a public officer or employee must yield some of the privileges which are enjoyed by the citizenry at large." (139 Cal.App.3d at p. 455.)[17]

In *Civil Service Assn.*, *supra*, the Court of Appeal recognized as "incongruous" that the only group of employees as to whom a need for polygraph testing has been recognized is now exempt from such testing. (*Id.*, at p. 458.) Although it recognized that this legislative scheme might not be "either wise or absolutely equitable" (*ibid.*), the Court of Appeal upheld the scheme against an equal protection challenge similar to the one presented here. The court stated that a "rational basis" could be found for the legislative scheme in that "[t]he Legislature has apparently decided that the need to maintain peaceful officer-employer relations outweighs any contribution to crime detection which might be gained by requiring officers to submit to polygraph examinations." (*Ibid.*)[18]

However, none of the authorities cited in that case stands for the proposition that a citizen can be arbitrarily deprived of a basic constitutional right in return for continued public employment. The mere status of being employed by the government should not compel a citizen to forfeit his or her fundamental right of privacy. Public employees are not second-class citizens within the ken of the Constitution.

As this court recently suggested when it held that strikes by public sector employees are neither illegal nor tortious under California law, legal distinctions between public and private sector employees that operate to abridge basic rights cannot withstand judicial scrutiny unless justified by a compelling governmental interest. (*County Sanitation Dist. No. 2 v. Los Angeles County Employees' Assn.* (1985) 38 Cal.3d 564, 585-586, 590 [214 Cal.Rptr. 424, 699 P.2d 835].) However much public service constitutes a benefit and imposes a duty to uphold the public interest, a public sector

---

[17]The original source of this dictum is *Forstner v. City etc. of San Francisco* (1966) 243 Cal.App.2d 625, 632 [52 Cal.Rptr. 621]. That case affirmed the rehiring and payment of back salary to a probation officer dismissed for insubordination on the ground that his beard tended to identify him with "beatnikism" in violation of an informal dress code for public employees. The employee did not claim a constitutional right to wear a beard, but merely that his refusal to shave the beard did not constitute insubordination since his job performance rating was excellent.

[18]In finding a rational basis for the legislative classification, the court in *Civil Service Assn.*, *supra*, did not consider the fact that the category of "public safety officer" extends far beyond those few groups of employees whose uninterrupted services may be considered critical to the public health or safety. The court also did not consider the effect of the constitutional right of privacy on the administration of compulsory polygraph examinations to employees. We therefore overrule the holding in *Civil Service Assn.* v. *Civil Service Com.*

employee, like any other citizen, is born with a constitutional right of privacy. ■ ■■■ A citizen cannot be said to have waived that right in return for the "privilege" of public employment, or any other public benefit, unless the government demonstrates a compelling need. (See *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d at p. 507.)[19]

## C. *The Asserted Governmental Interests.*

■ The next step in any equal protection analysis is to inquire into and scrutinize the legislative purposes behind a challenged classification.

The City asserts, primarily, that the compelling justification for invading the privacy of public employees, but not private sector employees, is the special position of trust involved in public employment. It again relies on *Civil Service Assn.* v. *Civil Service Com., supra,* 139 Cal.App.3d at pages 455-456, which suggests in dicta that the public-private employee distinction in section 432.2, subdivision (a), is constitutional based on such a "public trustee" rationale. We recognize that there may be a rational relationship between polygraph testing as a method of investigation and maintaining the real and apparent integrity of the public service. Public employees are trustees of the public interest and thus owe a special duty of integrity. But this distinction, without more, cannot be said to provide a *compelling* justification for such an inherent intrusion on an ordinary public employee's fundamental right of privacy, particularly where less intrusive means to investigate alleged wrongdoing are available.

---

[19]In its amicus curiae brief in support of respondents, the City and County of San Francisco asserts that public employment is distinctly different from private employment in ways that would put the government at a debilitating disadvantage if, like private employers, it could not compel its employees to undergo polygraph examinations. The amicus argues: "Specifically, the permanent employee's tenure is a valuable property right that cannot be taken away or impaired without a due process hearing. (*Skelly* v. *State Personnel Board* (1975) 15 Cal.3d 194, 206-207 [124 Cal.Rptr. 14, 539 P.2d 774]) . . . If the employee does not agree with the decision to terminate, he or she can seek further appellate relief and finally may sue the employer in court. Once in court, the public employer bears the burden, once again, to establish that the weight of the evidence supports the decision to dismiss the employee."

This argument does not provide a rational, let alone compelling justification for subjecting only ordinary public sector employees to compulsory polygraph tests. Private sector employees and "public safety officers" may also challenge certain wrongful terminations in court, but there is no exception to section 432.2 that permits their employers to compel them to submit to a polygraph test as a means to investigate or gather evidence. In any case, it is unclear how polygraph results would help the government (or any other employer) in court since such evidence is inadmissible in judicial and administrative proceedings in California. (See fn. 12, *ante.*) We remain unconvinced that a public employee's right to due process before termination provides a compelling governmental interest in forcing the employee to undergo a polygraph test the Legislature and courts have found to be less than reliable.

The city also asserts as a compelling justification the concomitant right of the public to an honest and impartial government. In *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662 [114 Cal.Rptr. 345, 522 P.2d 1345], we upheld legislation requiring a variety of public officials and candidates for public office to make certain disclosures about their personal financial interests. (Gov. Code, § 3600 et seq.) The compelling public interest in an "honest and impartial government" relied on in *MacMillen* referred to conflicts of interest and the integrity of the decision-making processes of government. We rejected an argument that their right of privacy "must inevitably prevail over the right of the public to an honest and impartial government." (*Id.*, at p. 672.) We found the Legislature intended to enjoin only "substantial" conflicts of interest and that the required disclosure related only to agency action or decision-making having a "material economic effect" on the decision-maker's economic interests. (11 Cal.3d at p. 671.)

The instant case is clearly distinguishable from *MacMillen*. Although the government has a compelling interest in preventing the theft of public monies, suspects can be investigated by alternative and less intrusive means. Private employees and public safety officers suspected of embezzlements or similar wrongdoings cannot be investigated by means of compulsory polygraph tests. Thus, unlike legislation that compels certain public officials or candidates for public office to make limited financial disclosure, the infringement on privacy rights here is greater than necessary to protect the public interest.

Even assuming, arguendo, that the public's interest in "an honest and impartial government" would be sacrificed if *certain* public officials and employees were not subject to compulsory polygraph testing, the state must establish the unavailability of less offensive alternatives and demonstrate that the statutory intrusion on the cherished right of privacy is drawn with narrow specificity. (See *Bagley* v. *Washington Township Hospital Dist.*, *supra*, 65 Cal.2d at p. 507.) The distinctions currently drawn, which deny *every* public employee (except public safety officers) protection from involuntary polygraph testing, are not necessary to further any compelling public interest.

The incongruity of the instant legislative scheme is further highlighted by the fact that the compulsory polygraph testing of ordinary public employees has consistently been viewed as *not* essential to the public interest, while the testing of police officers and related personnel, whom the Legislature has immunized from testing, *has been* held essential.

A series of California cases decided prior to the enactment of the Public Safety Officers Procedural Bill of Rights Act (and prior to the adoption of

the constitutional amendment on the right to privacy) upheld compulsory polygraph testing of police officers because of the "peculiar and delicate position police officers hold in society. . . . 'Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. . . .'" (*Frazee* v. *Civil Service Board* (1959) 170 Cal.App.2d 333, 335 [338 P.2d 943], quoting *Christal* v. *Police Com.* (1939) 33 Cal.App.2d 564, 567 [92 P.2d 416].) "[I]n the light of his sworn duty to aid in the investigation of crime, the order that he complete the [polygraph] test he had requested was reasonable." (*McCain* v. *Sheridan* (1958) 160 Cal.App.2d 174, 177-178 [324 P.2d 923].) "[These] cases . . . do not stand for any more than the upholding of orders to take polygraph tests *by law enforcement officers,* and as to them only when appropriate circumstances are present. . . ." (*Fichera* v. *State Personnel Board* (1963) 217 Cal.App.2d 613, 622 [32 Cal.Rptr. 159], italics added; see also *Szmaciarz* v. *State Personnel Bd.* (1978) 79 Cal.App.3d 904, 915-916 [145 Cal.Rptr. 396] [correctional officer].)[20]

According to the express statement of purposes contained in Government Code section 3301 (and quoted above), the governmental interest served by the Public Safety Officers Procedural Bill of Rights Act is the promotion of labor harmony and the consequent avoidance of interruptions in services by the state's public safety officers. "The use of polygraph examinations and similar tests by employers has been widely criticized by labor unions and other employee organizations. [Citations.] Prohibiting recriminations for refusing such tests eliminates one area of potential employer-employee discord." (*Civil Service Assn.* v. *Civil Service Com., supra,* 139 Cal.App.3d at p. 457.)

The city contends that public safety officers provide critical public services the interruption of which would threaten the safety and health of the state's citizens. Of course, the state does have a compelling interest in preventing work stoppages that pose a substantial and imminent threat to public health or safety. (*County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn., supra,* 38 Cal.3d at p. 586.) However, the definition of

---

[20]Courts in other jurisdictions have similarly relied on the unique status of law enforcement officers, as distinguished from other public employees, in upholding compulsory polygraph testing of the former. (See *Talent* v. *Abilene* (Tex. 1974) 508 S.W.2d 592, 596; *In re Fairbanks, supra,* 287 N.W.2d at p. 581; *Seattle Police Officers' Guild* v. *City of Seattle, supra,* 494 P.2d at p. 490; see also *Oberg* v. *City of Billings* (Mont. 1983) 674 P.2d 494, 500 (Haswell, C. J., dis.); *State Dept. of Highway Safety, etc.* v. *Zimmer* (Fla.App. 1981) 398 So.2d 463, 466 [15 A.L.R.4th 1197] (Anstead, J., dis.).)

"public safety officer" employed by section 3301 bears little relation to the criticality or essentiality of the functions those public employees perform.

Public employees presently categorized as being "public safety officers" include not only sheriffs and police officers, but also enforcement personnel from, inter alia, the Departments of Horse Racing, Consumer Affairs, Mental Health, Social Services, Fish and Game, Motor Vehicles, Labor Standards, Housing and Community Development, Food and Drugs, Forestry, Parks and Recreation, Alcoholic Beverage Control, Insurance, and Corporations, the Boards of Medical Quality Assurance and Dental Examiners, the Contractors' State License Board, the Secretary of State's office, the Controller's office, the Public Employees Retirement System and child support investigators. (Gov. Code, § 3301 ["public safety officer" defined as all peace officers specified in Pen. Code, §§ 830.1, 830.2, 830.3, 830.31 except subd. (f), 830.4 except subd. (f), and 830.5].) It can hardly be claimed that all of these employees provide critical and essential services the interruption of which would pose an imminent threat to the health or safety of the state's citizens. (See *County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn., supra,* 38 Cal.3d at p. 586; *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 140 [185 Cal.Rptr. 232, 649 P.2d 874].)[21]

Furthermore, the definition of public safety officer is greatly *under* inclusive as well because it fails to include certain public employees whose services may indeed be considered critical, such as firefighters and hospital workers. (See *County Sanitation Dist. No. 2* v. *Los Angeles County Employees' Assn., supra,* 38 Cal.3d at pp. 581, fn. 26, 585, fn. 32.) Under the current legislative scheme, these employees may still be subjected to involuntary polygraph examinations and consequent discord with their employers.

The statutory classification is therefore so over- and underinclusive that we fail to find even a rational relation between it and the asserted purpose of preventing interruptions in critical public services.

---

[21]A similar overinclusiveness recently proved fatal to a Montana statute governing the use of polygraph examinations in employment. In *Oberg* v. *City of Billings* (Mont. 1983) 674 P.2d 494, the Montana Supreme Court struck down a statute which prohibited polygraph testing as a condition of employment for all employees *except* employees of "public law enforcement agencies." The court found that this latter category, by its terms, included not only police officers, but also "secretaries, clerks, dispatchers, meter maids and dogcatchers," all of whom are employees of "public law enforcement agencies." (*Id.,* at p. 497.) The asserted legislative purpose of maintaining "the highest integrity" among police officers, who "occupy a particularly high position of public trust" (*id.,* at p. 496) was held not to be rationally served by this overly broad classification.

We find no compelling state interest that justifies the unequal treatment of "public safety officers," as currently defined, and all other public employees in a manner that intrudes on the latter group's constitutional right of privacy. Nor do we find a compelling state interest that justifies the unequal treatment of private employees and the broad class of public employees who remain subject to involuntary polygraph testing. Moreover, the distinctions currently drawn are not necessary to further any compelling governmental interest in the provision of critical public health and safety services. Neither classification serves a compelling governmental interest and therefore both deny unprotected employees equal protection of the law.

## IV.

We conclude that the Bureau's orders to its employees to submit to polygraph examinations as a condition of their employment intruded upon the employees' constitutionally protected zone of individual privacy and also violated their right to equal protection under the law.

The judgment denying CEA's request for a preliminary injunction to halt administration of the polygraph examination is therefore reversed.

Mosk, J., Reynoso, J., Grodin, J., and Lui (Elwood), J.,* concurred.

**BIRD, C. J.**—I agree with the lead opinion that the current legislative scheme, which requires only certain public employees to submit to polygraph examinations as a condition of their continued employment, creates an unconstitutional burden on an employee's fundamental right to privacy. However, I would complete the analysis and find that compelled polygraph testing constitutes a violation of an employee's right to privacy.

This issue has not been addressed in any published opinion in this state. The present case provides an opportunity to resolve the issue and to further elucidate the nature of the privacy right expressly provided in our Constitution. (Cal. Const., art. I, § 1.)[1]

This court first examined the implications of the privacy amendment in *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222]. In

---

*Associate Justice, Court of Appeal, Second District, Division Three, assigned by the Chairperson of the Judicial Council.

[1]In 1972, the voters of California amended article I, section 1 of the Constitution to include the right of privacy. That section now provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy.*" (Italics added.)

an attempt to sketch the contours of the new constitutional provision, the court reiterated the concerns expressed by the proponents of the provision in the election brochure: "'The right of privacy is the right to be left alone. . . . It protects our homes, our families, *our thoughts, our emotions, our expressions, our personalities* [italics added] . . . . [¶] *Fundamental to our privacy is the ability to control circulation of personal information.* [Italics in original.] . . . This is essential to social relationships and personal freedom.'" (*Id.,* at p. 774.)

The amendment has been characterized as part of a multi-tiered endeavor to combat "the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." (*Ibid.*) Our Constitution, statutes, and case law all underscore the fact that the people of this state want a political system which protects individual rights and liberties. The California Legislature has often acknowledged the importance of our privacy protections. For example, it has enacted statutes designed to ensure that every adult retains control over: major decisions regarding medical care (see Health & Saf. Code, § 7185 et seq.), the dissemination of personal information (Civ. Code, § 1798 et seq.), academic records (Ed. Code, § 67140 et seq.), consumer credit records (Civ. Code, § 1785.1 et seq. and § 1786 et seq.), and business records (*id.,* § 1799 et seq.). These provisions represent only a few of the many ways in which the Legislature has acted to protect the privacy of its citizens' lives in the wake of "'[t]he proliferation of government snooping . . . [that] is threatening to destroy our traditional freedoms.'" (*White* v. *Davis, supra,* 13 Cal.3d at p. 774.)

With similar consistency, decisions by our state courts involving privacy have reflected a concern about those technological advances which may be utilized to erode individual liberties. As this court observed in *Burrows* v. *Superior Court* (1974) 13 Cal.3d 238, 248 [118 Cal.Rptr. 166, 529 P.2d 590], the development of "sophisticated instruments [has] accelerated the ability of government to intrude into areas which a person normally chooses to exclude from prying eyes and inquisitive minds. Consequently judicial interpretations of the reach of the constitutional protection of individual privacy must keep pace with the perils created by these new devices." [Fn. omitted.]

In the instant proceeding, this court is presented with such a challenge. The right to privacy guarantees to each individual the right to determine "to what extent his thoughts, sentiments, and emotions shall be communicated to others." (Warren & Brandeis, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193, 198.) As the majority note, polygraph examinations are

specifically designed to overcome this zone of privacy. (See majority opn., *ante,* at p. 944.) The polygraph device measures the examinee's psychological response by monitoring physiological functions even when she has chosen not to respond verbally to an intrusive question. This method of interrogation robs the individual of her ability to choose which thoughts will be communicated to others and which will not.

Equally disturbing are the circumstances under which the polygraph test is administered. Generally, the examinee's behavior is surreptitiously observed while she waits to enter the testing room. Then, a series of highly personal pretest questions unrelated to the subject matter of the examination are asked. (See majority opn., *ante,* at p. 945.)

The examinee often has little or no control over the disclosure and subsequent use of any information gleaned in this manner. (Majority opn., *ante,* at p. 946.) Perhaps the most troubling aspect of this type of interrogation is the coercive atmosphere that attends the administration of the test. In situations like the present case, employees *must* divulge private information or risk losing their jobs.

The confluence of these factors leads the majority to conclude that "polygraph examinations inherently intrude upon the constitutionally protected zone of individual privacy." (Majority opn., *ante,* at p. 948.) However, the majority goes on to bottom its holding on equal protection grounds, abandoning the privacy analysis. I would follow through with the privacy analysis and conclude that compulsory polygraph testing constitutes a violation of the right to privacy.

Public employees may not be discharged from employment for their refusal to waive a constitutional right, nor may they be dismissed for the exercise of constitutional rights absent a showing that the restraints which the employing body would impose are justified by a compelling public interest. (*Gardner* v. *Broderick* (1968) 392 U.S. 273, 278 [20 L.Ed.2d 1082, 1086-1087, 88 S.Ct. 1913]; *Bogacki* v. *Board of Supervisors* (1971) 5 Cal.3d 771, 778 [97 Cal.Rptr. 657, 489 P.2d 537], cert. den. 405 U.S. 1030 [31 L.Ed.2d 488, 92 S.Ct. 1301]; *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409].)

Here, the City ordered its employees to submit to a polygraph examination as a condition of continued employment. (See majority opn., *ante,* at p. 942.) In practical terms, therefore, the order can only be interpreted as requiring the employees to either waive their constitutional right to privacy or risk having their employment terminated.

The power of the government to exact such a waiver was reviewed by this court in *Bagley* v. *Washington Township Hospital Dist., supra,* 65 Cal.2d 499. Under the constitutional standard established in *Bagley,* the condition imposed must satisfy a three-part test in order to assure that the restrictions are indeed necessary to a compelling state interest. (*Bagley, supra,* 65 Cal.2d at pp. 505-507; *Robbins* v. *Superior Court* (1985) 38 Cal.3d 199, 213 [211 Cal.Rptr. 398, 695 P.2d 695]; *Committee to Defend Reproductive Rights* v. *Myers* (1981) 29 Cal.3d 252, 265-266 [172 Cal.Rptr. 866, 625 P.2d 779, 20 A.L.R.4th 1118]; *Parrish* v. *Civil Service Commission* (1967) 66 Cal.2d 260, 271 [57 Cal.Rptr. 623, 425 P.2d 223].)

The government entity seeking to impose the condition must demonstrate that: (1) the condition reasonably relates to the purposes of the legislation which confers the benefit; (2) the value accruing to the public from the conditions imposed manifestly outweighs any resulting impairment of the constitutional right; and (3) there are no available alternative means less offensive to the constitutional right. (*Robbins, supra,* 38 Cal.3d at p. 213; *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at p. 270; *Bagley, supra,* 63 Cal.2d at pp. 501-502.) "To the extent that the restraint operate[s] beyond the sphere of the proffered justification [it] advance[s] no compelling public interest." (*Bagley, supra,* 65 Cal.2d at p. 502.)

The City's articulated interest in requiring polygraph examinations is to protect its revenues from theft by its employees. As this court noted in *Loder* v. *Municipal Court* (1976) 17 Cal.3d 859, 864 [132 Cal.Rptr. 464, 553 P.2d 624], the right of privacy does not necessarily prevail over the right of the public to an honest government. However, even if the interest asserted here may be considered highly significant, the City must satisfy the *Bagley* test to withstand the constitutional challenge to its practice.

The use of polygraph examinations to investigate theft by public employees furthers the purpose of ensuring responsible performance on the job. Therefore, it is reasonably related to the privilege of public employment. Thus, the first prong of the *Bagley* test has been satisfied.

Under the second part of the *Bagley* analysis, the state must demonstrate that "the utility of imposing the condition[] . . . manifestly outweigh[s] any resulting impairment of [the] constitutional right[]." (65 Cal.2d at p. 506.) As numerous cases since *Bagley* have elaborated, a court in undertaking this "weighing" process must carefully evaluate the importance of the constitutional right at stake and gauge the extent to which the individual's ability to exercise that right is threatened. Concomitantly, it must assess the

degree to which the condition imposed actually serves the state's asserted interest. (See, e.g., *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at pp. 273-274; *City of Carmel-by-the-Sea* v. *Young* (1970) 2 Cal.3d 259, 272 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].)

As noted above, efforts to secure the fundamental right to privacy have permeated every branch of our state government. The constitutional right at issue here is "clearly among the most intimate . . . of all constitutional rights." (See *Committee to Defend Reproductive Rights* v. *Myers, supra,* 29 Cal.3d at p. 275.) With this understanding in mind, the extent to which the condition imposed by the state will actually impair the exercise of this vital right must be considered.

As the majority opinion indicates in resolving that issue, this court need only consider the nature of the polygraph examination to recognize that the right to privacy will be severely impaired. (Majority opn., *ante,* at pp. 945-948.) The device is designed so that an examinee cannot prevent a response to a highly personal question even by remaining silent. This method of interrogation thus strikes at the very heart of the privacy guarantee. Utilization of this test all but precludes the exercise of this fundamental constitutional right.

Consequently, it is difficult to see how the benefits which the state derives from requiring these examinations could "manifestly outweigh" such a significant impairment. In this state, the results of polygraph examinations are considered too unreliable to be admissible in court or administrative proceedings.[2] (*People* v. *Thornton* (1974) 11 Cal.3d 738, 763-764 [114 Cal.Rptr. 467, 523 P.2d 267], cert. den. 420 U.S. 924 [43 L.Ed.2d 393, 95 S.Ct. 1118], disapproved on another point in *People* v. *Flannel* (1979) 25 Cal.3d 668 [160 Cal.Rptr. 84, 603 P.2d 1]; *Aengst* v. *Board of Medical Quality Assurance* (1980) 110 Cal.App.3d 275, 280-283 [167 Cal.Rptr. 796]; but see *Witherspoon* v. *Superior Court* (1982) 133 Cal.App.3d 24, 33-35 [183 Cal.Rptr. 615].) The City responds to this argument by stating that the polygraph examinations were intended to be used as an investigative tool and not to ferret out wrongdoers. However, the potential investigative benefits of such a method could not possibly outweigh so drastic an intrusion on an employee's right to privacy.

---

[2]Although some California courts have held that polygraph examinations are useful aids in internal investigations (see, e.g., *Fichera* v. *State Personnel Board* (1963) 217 Cal.App.2d 613 [32 Cal.Rptr. 159]), none of these cases involved a challenge on the basis of a violation of the constitutional right of privacy.

The third and final component of the *Bagley* test requires the state to establish the unavailability of less offensive alternatives and to demonstrate that the statutory intrusion on the constitutional right is narrow and specific. (See *Bagley, supra,* 65 Cal.2d at p. 507; *Fort* v. *Civil Service Commission* (1964) 61 Cal.2d 331, 338 [38 Cal.Rptr. 625, 392 P.2d 385].) In effect, this part of the *Bagley* test requires the state to adopt the "least offensive alternative" adequate to achieve the asserted interest.

In the instant case, no evidence was presented by the City regarding the feasibility or restrictiveness of any specific alternatives. (See *Robbins, supra,* 38 Cal.3d at p. 214, fn. 20.)[3] While some argue that the polygraph may be a useful investigative technique, efficiency is not equivalent to necessity. The City may question its employees or use other investigative methods to maintain the integrity of its Marine Bureau.

Moreover, the current statutory scheme, which upholds compulsory testing for only certain public employees, does not limit the intrusion on personal rights to the degree necessary to deal with the specific abuses alleged here. (*Bagley, supra,* 65 Cal.2d at p. 508.) As the majority note, public safety officers suspected of embezzlement cannot be compelled to undergo testing. (Majority opn., *ante,* at p. 953.) The exemption for police officers exists despite the fact that they have been found to occupy particularly sensitive positions in society. (See, e.g., *Frazee* v. *Civil Service Board* (1959) 170 Cal.App.2d 333, 335 [338 P.2d 943], quoting *Christal* v. *Police Com.* (1939) 33 Cal.App.2d 564, 567-568 [92 P.2d 416].) Consequently, the City has failed to satisfy both the second and third prongs of the *Bagley* test. The condition imposed on these public employees does not advance a compelling public interest commensurate with the waiver of their fundamental right to privacy as guaranteed by our Constitution.

McClosky (Eugene), J.,* concurred.

---

[3]Neither the party complaining of the unconstitutional condition nor this court bears the burden of establishing that effective and less restrictive alternatives exist. That burden of proof is borne by the governmental entity that seeks to impose the condition. (*Robbins, supra,* 38 Cal.3d at p. 215.)

*Associate Justice, Court of Appeal, Second District, Division Four, assigned by the Chairperson of the Judicial Council.