[No. S150402. Feb. 9, 2009.]

THOMAS SPIELBAUER, Plaintiff and Appellant, v.
COUNTY OF SANTA CLARA et al., Defendants and Respondents.

708

## Counsel

Burnett, Burnett & Allen and Douglas B. Allen for Plaintiff and Appellant.

Michael D. Hersh, Beverly Tucker, Rosalind D. Wolf, Robert E. Lundquist, Brenda E. Sutton-Wills and John F. Kohn for California Teachers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Ann Miller Ravel, County Counsel, Lori E. Pegg, Lead Deputy County Counsel, and Marcy L. Berkman, Deputy County Counsel, for Defendants and Respondents.

Edmund G. Brown, Jr., Attorney General, David Chaney, Chief Assistant Attorney General, Jacob A. Appelsmith, Assistant Attorney General, Miguel A. Neri, Fiel D. Tigno and Karen Huster, Deputy Attorneys General, as Amici Curiae on behalf of Defendants and Respondents.

Raymond G. Fortner, County Counsel (Los Angeles), Lester J. Tolnai, Assistant County Counsel, and Pirjo L. Ranasinghe, Deputy County Counsel, for County of Los Angeles as Amicus Curiae on behalf of Defendants and Respondents.

Kathleen M. Bales-Lange, County Counsel (Tulare), Ronald E. Rezac, Chief Deputy County Counsel, and Deanne H. Peterson, Deputy County Counsel, for California League of Cities, California State Association of Counties, California School Boards Association, Education Legal Alliance and California Public Employers Labor Relations Association as Amici Curiae on behalf of Defendants and Respondents.

Jan Scully, District Attorney (Sacramento) and Albert C. Locher, Assistant Chief Deputy District Attorney, for Sacramento County District Attorney as Amicus Curiae on behalf of Defendants and Respondents.

Jones & Mayer, Martin J. Mayer and Krista MacNevin for California State Sheriffs' Association and California Police Chiefs' Association as Amici Curiae on behalf of Defendants and Respondents.

Carroll, Burdick & McDonough, Ronald Yank, Gary M. Messing, Gregg McLean Adam, Jason H. Jasmine and Jennifer S. Stoughton for Peace Officers Research Association of California Legal Defense Fund as Amicus Curiae on behalf of Defendants and Respondents.

**OPINION**

**BAXTER, J.**—Plaintiff, a deputy public defender, was investigated by his employer, the county, upon allegations that he had made deceptive statements to the court while representing a criminal defendant. During each of several attempts to interview plaintiff in the matter, a supervising attorney directed plaintiff to answer questions about the incident, told plaintiff that his refusal to cooperate would be deemed insubordination warranting discipline up to and including dismissal, *but advised plaintiff—accurately—that no use in a criminal proceeding (i.e., criminal use) could be made of his answers.* Nonetheless, on advice of counsel, plaintiff declined to answer, invoking his privilege against compelled self-incrimination under both the federal and state Constitutions. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15.) He was terminated from employment on grounds of the deceptive court conduct and for disobeying the employer's orders to answer questions.

Plaintiff sought mandate to obtain reinstatement, urging, among other things, that he could not be compelled, on pain of dismissal, to answer potentially incriminating questions unless he received, in advance, a formal grant of immunity from direct or derivative use of his answers in any criminal case against him. The trial court upheld the termination, but the Court of Appeal reversed. The appellate court found substantial evidence that plaintiff had engaged in deceptive court conduct. However, it agreed with

plaintiff's contention that, having invoked his constitutional right against self-incrimination, he could not be compelled, by threat of job discipline, to answer his employer's questions unless his constitutional privilege was first supplanted by an affirmative grant of criminal use immunity coextensive with the constitutional protection. We granted review to address the latter issue.

We conclude that the Court of Appeal erred. United States Supreme Court decisions, followed for decades both in California and elsewhere, establish that a public employee may be compelled, by threat of job discipline, to answer questions about the employee's job performance, so long as the employee is not required, on pain of dismissal, to *waive* the constitutional protection against criminal use of those answers. Here, plaintiff was not ordered to choose between his constitutional rights and his job. On the contrary, he was truthfully told that, in fact, no criminal use could be made of any answers he gave under compulsion by the employer. In the context of a noncriminal public employment investigation, the employer was not further required to seek, obtain, and confer a formal guarantee of immunity before requiring its employee to answer questions related to that investigation.

Accordingly, we will reverse the judgment of the Court of Appeal.

## FACTS AND PROCEDURE

In January 2003, plaintiff, a Santa Clara County deputy public defender, represented Michael Dignan on charges of ammunition possession by a felon. Troy Boyd had been arrested with Dignan, but not detained. Plaintiff proposed to introduce, on Dignan's behalf, Boyd's statement to the police that his parents owned the house where the ammunition was found, and he had rented it since he was 19 years old. The apparent purpose of the proffered statement was to raise a reasonable doubt about control of the area in which the contraband had been discovered. But the statement's efficacy for that purpose depended, as the Court of Appeal noted, on its "ambiguity and incompleteness"; as Boyd later explained, he did rent the house from his parents, but he sublet portions of it to others, including Dignan. Thus, if Boyd were cross-examined on the witness stand, the true context of his statement would likely be revealed.

The prosecutor moved in limine to exclude Boyd's extrajudicial statement as inadmissible hearsay. A hearing on the motion took place on Monday, January 27, 2003, before Judge Tielh. The prosecutor argued the defense could not claim Boyd's unavailability as the basis for a hearsay exception, because there was no evidence the defense had exercised due diligence to procure Boyd's presence at trial. When the court asked plaintiff what hearsay exception would apply, plaintiff said he had not sent out an investigator to

look for Boyd in part because "Mr. Boyd has a warrant for his arrest. And if the San Jose Police are not going to be able to find Mr. Boyd, I think that my investigator is going to be very hard put to find an individual who is avoiding contact with anybody that has to do with the judicial system."

Plaintiff presented a $5,000 warrant for Boyd and argued that this met his burden of showing Boyd was unavailable. Plaintiff urged that exclusion of Boyd's statement would deprive his client of a critical defense. Plaintiff further represented that Boyd had experienced problems with the law and avoided all contact with authority figures. Ultimately, the court ruled in limine that Boyd's hearsay statement would be admitted.

Plaintiff then requested the jury be instructed that Boyd was a fugitive, so jurors would not wonder why he had failed to call Boyd. When the prosecutor remarked that this was a good question, because plaintiff had exerted no effort to find Boyd, plaintiff responded that he wanted to tell the jury he had not done so because "[Boyd's] got a warrant for his arrest and he's ducking." Plaintiff indicated he intended to move the arrest warrant into evidence in order to explain Boyd's absence.

Three days after this court hearing, a police sergeant went to the house in question, where he found Boyd. Boyd told the officer he had recently spoken to "a public defender investigator." Confronted in court with this information, plaintiff indicated it was he who had spoken with Boyd. Plaintiff related that on Sunday, January 26, 2003—the day before he claimed in court that Boyd was an unavailable fugitive—he went to the house to take photographs, where he found Boyd with a group watching the Super Bowl. According to plaintiff, he carried no subpoena because he did not expect Boyd to be there. Plaintiff also said Boyd had indicated he would not cooperate in being served and did not wish to testify. Plaintiff maintained that his accidental encounter with Boyd was "attorney work product," which he had no obligation to disclose.

The prosecutor argued that plaintiff had made an affirmative misrepresentation to the court. Without ruling on this assertion, the court, per Judge Tielh, determined that Boyd was an available witness, and that this would be considered in passing upon any trial objection to the admission of Boyd's hearsay statement.

In late February or early March 2003, Chief Assistant Public Defender David Mann learned of this incident. Mann was told that the prosecutor in the Dignan case was getting transcripts in the matter and wanted "to 'go after' [plaintiff] in some fashion." When Mann contacted the district attorney's office, he was advised that three options were being considered—to file

misdemeanor charges against plaintiff, to report him to the State Bar, or to "leave it to [the Public Defender's] office to handle."

Deciding not to wait for the district attorney's decision, Mann initiated an internal investigation.[1] On April 1, 2003, plaintiff appeared with his counsel, Zacharias Ledet, for an interview in the matter. Also present were Joe Guzman, supervisor of the felony division of the public defender's office, and a departmental investigator, Alayne Bolster. When Bolster asked plaintiff to describe his conversation with Boyd, Ledet interjected that plaintiff refused to answer on grounds of protection afforded him by the federal and state Constitutions and the laws of California.

Guzman responded by addressing the following to plaintiff: "Tom, you have a right to remain silent and not incriminate yourself. Your silence, however, may be deemed insubordination, leading to administrative discipline up to and including termination. *Any statement made during this interview cannot, and I emphasize cannot, be used against you in any subsequent criminal proceeding.*" (Italics added.)

Ledet retorted that the protection against penal use asserted by Guzman only applied to peace officers, and that Guzman's advisement thus afforded plaintiff no protection "unless you receive a ruling from a Court of Law." Guzman then stated he wanted to "make clear that this is not a criminal proceeding. . . . This is an employee investigation . . . . What we do here stays within the Public Defender's Office. This is not going to be sent to the DA's Office, okay. What I'm saying is, . . . anything you say at this meeting cannot be used against you in a criminal proceeding. So you are directed to answer the questions and your refusal to answer the questions will be deemed as insubordination." These points were reiterated in full later in the interview. Through Ledet, plaintiff continued to object.

A second interview, with Ledet present, occurred on April 10, 2003. Guzman advised that, because this was an internal investigation, plaintiff "[did] not have a right to refuse to answer," and that such refusal would be insubordination warranting discipline up to and including termination, but that "any information [plaintiff] provides in this particular interview cannot and will not be used against him in a criminal case." Ledet responded that Guzman had provided no authority for his assurances, and that cases cited in correspondence between the parties were concerned only with peace officers.

---

[1] In May 2003, the district attorney did file a misdemeanor complaint charging plaintiff with a deceit upon the court in violation of Business and Professions Code section 6128. As the Court of Appeal related, "[a]lthough the present record is incomplete on this point, plaintiff asserts that the action was ultimately dismissed by stipulation."

At the conclusion of this meeting, Ledet asserted that Guzman had exhausted his right under governing personnel policies to interview plaintiff, and that further efforts to do so "would be unreasonable." Ledet further stated that plaintiff would continue to invoke his rights not to answer.

On June 9, 2003, Mann recommended plaintiff's termination on three civil service grounds: (1) insubordination (stemming from plaintiff's refusal to answer investigators' questions), (2) gross misconduct unbecoming a county officer (stemming from the Dignan incident), and (3) seeking, in violation of office rules governing attorney ethics, to mislead a court by artifice or false statement. Plaintiff sought a prediscipline administrative hearing. (See *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 215 [124 Cal.Rptr. 14, 539 P.2d 774].) The hearing officer sustained the charges and discipline, as did the county personnel board.

Plaintiff sought mandamus relief in the superior court. Among other things, he insisted he could not be dismissed for refusing, on grounds of his constitutional right against self-incrimination, to answer his employer's potentially incriminating questions unless he received, in advance, a formal grant of criminal use immunity. The court denied the petition, ruling that substantial evidence supported the charges and discipline, and that plaintiff was not entitled to formal immunity before being compelled to answer his employer's questions.

The Court of Appeal reversed. The appellate court found substantial evidence supporting the charge that plaintiff's representation of Dignan involved deceptive conduct unbecoming a county officer and tending to discredit his office.[2] However, the court agreed with plaintiff's contention that a public employee must receive a formal grant of criminal use immunity before being required, on pain of discipline, to answer potentially incriminating official questions about his or her job performance.

Hence, the Court of Appeal held, the employer's mere advisements and assurances that plaintiff's statements could not be used criminally were insufficient to permit compulsion of his answers. The discipline imposed, the court noted, was based in part on a finding—legally erroneous in the court's view—of plaintiff's insubordination for refusing to answer, and it was not clear he otherwise would have been terminated. Accordingly, the Court of Appeal reversed the superior court's judgment with directions to issue a writ of mandamus directing the county personnel board to vacate and reconsider its decision in light of the views expressed.

---

[2] The Court of Appeal also found unmeritorious plaintiff's claims that he was denied an impartial decision maker because both his *Skelly* hearing officer and the county personnel board were burdened by conflicts of interest. Those issues are not before us.

We granted review, limited to the following issue: When a public employee invokes his or her Fifth Amendment right against self-incrimination in a public employer's investigation of the employee's conduct, must the public employer offer immunity from any criminal use of the employee's statements before it can dismiss the employee for refusing to answer questions in connection with the investigation?[3] Turning to that question, we conclude that the answer is no.

## DISCUSSION

The Fifth Amendment to the United States Constitution declares that "[n]o person . . . shall be compelled *in any criminal case* to be a witness against himself . . . ." (Italics added.) The California Constitution similarly provides that "[p]ersons may not . . . be compelled *in a criminal cause* to be a witness against themselves . . . ." (Cal. Const., art. I, § 15, italics added.)

■ The constitutional guarantee against compelled self-incrimination protects an individual from being forced to testify against himself or herself in a pending criminal proceeding, but it does more than that. It also privileges a person not to answer official questions in any other proceeding, "civil or criminal, formal or informal," where he or she reasonably believes the answers might incriminate him or her in a criminal case. (*Lefkowitz v. Turley* (1973) 414 U.S. 70, 77 [38 L.Ed.2d 274, 94 S.Ct. 316] (*Turley*); see *Kastigar v. United States* (1972) 406 U.S. 441, 444–445 [32 L.Ed.2d 212, 92 S.Ct. 1653] (*Kastigar*).) One cannot be forced to choose between forfeiting the privilege, on the one hand, or asserting it and suffering a penalty for doing so on the other. (*Malloy v. Hogan* (1964) 378 U.S. 1, 8 [12 L.Ed.2d 653, 84 S.Ct. 1489].)

■ In many instances, of course, it is necessary or highly desirable to procure citizens' answers to official questions, including their formal testimony under oath. In such circumstances, an individual's invocation of the privilege against self-incrimination would frustrate legitimate governmental objectives. In light of the competing interests, it is well established that incriminating answers may be officially compelled, without violating the privilege, when the person to be examined receives immunity "coextensive

---

[3] Amicus curiae briefs addressing this issue have been filed in support of respondent county by (1) the Attorney General of California, (2) the County of Los Angeles, (3) the Sacramento County District Attorney, (4) the Peace Officers Research Association of California Legal Defense Fund, (5) the California State Sheriffs' Association and the California Police Chiefs Association, and (6) the League of California Cities, the California State Association of Counties, the California School Boards Association and its Education Legal Alliance, and the California Public Employers Labor Relations Association. The California Teachers Association has filed an amicus curiae brief in support of plaintiff.

with the scope of the privilege"—i.e., immunity against both direct and "derivative" criminal use of the statements. (*Kastigar, supra*, 406 U.S. 441, 449–462; see *Murphy v. Waterfront Comm'n* (1964) 378 U.S. 52, 54 [12 L.Ed.2d 678, 84 S.Ct. 1594].) In such cases, refusals to answer are unjustified, "for the grant of immunity has removed the dangers against which the privilege protects. [Citation.]" (*Kastigar, supra*, at p. 449.)

■ Official compulsion, for purposes of the privilege, is not limited to court process, and may include a public employer's threat to dismiss an employee for refusing to answer potentially incriminating questions. (*Garrity v. New Jersey* (1967) 385 U.S. 493, 496–497 [17 L.Ed.2d 562, 87 S.Ct. 616] (*Garrity*).) Thus, the law is clear that incriminating answers coerced from a public employee under threat of dismissal *cannot be used against the employee in a criminal proceeding*. (*Id.*, at p. 500.) This is so even where the employee received no advance grant of formal immunity. (See *id.*, at p. 495.)

On the other hand, the constitutional privilege against compelled self-incrimination in a *criminal* case or cause (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15) does not protect against the *nonpenal* adverse use of officially compelled answers. (E.g., *Segretti v. State Bar* (1976) 15 Cal.3d 878, 886–887 [126 Cal.Rptr. 793, 544 P.2d 929]; *Blackburn v. Superior Court* (1993) 21 Cal.App.4th 414, 426 [27 Cal.Rptr.2d 204].) Thus, incriminating answers given by a public employee under threat of job sanction for refusal to answer may themselves form the basis for job discipline, including termination, so long as the employee has requisite protection against the criminal use of such statements.

The United States Supreme Court has been less than clear about the minimum circumstances under which one may be officially compelled, over his or her constitutional objection, to give incriminating answers for nonpenal use. In *Adams v. Maryland* (1954) 347 U.S. 179 [98 L.Ed. 608, 74 S.Ct. 442] (*Adams*), a federal statute provided that testimony before a congressional committee could not be used criminally against the witness. Nonetheless, the defendant, who had been summoned to answer questions before a Senate investigating committee, was convicted of Maryland charges on the basis of his confession before the committee that he ran a gambling business in that state.

Seeking to uphold the conviction, the state urged, among other things, that the defendant had waived the statutory protection by failing, before the committee, to claim his constitutional privilege against self-incrimination. The high court responded that "no language of the [statute] requires such a claim in order for a witness to feel secure that his testimony will not be used

to convict him of [a] crime." (*Adams, supra*, 347 U.S. 179, 181.) Indeed, the court noted, such an interpretation would render the statute superfluous, for "a witness does not need any statute to protect him from the [criminal] use of self-incriminating testimony he is compelled to give over his objection. *The Fifth Amendment takes care of that without a statute.*" (*Ibid.*, italics added.)

However, other Supreme Court cases contain language that might suggest that one subjected to coercive official questioning in a noncriminal setting may insist on the constitutional privilege, without fear of sanction, until the privilege is supplanted, and thus removed, by the authorized grant or conferral of an "immunity" coextensive with the privilege itself. (E.g., *Chavez v. Martinez* (2003) 538 U.S. 760, 771 [155 L.Ed.2d 984, 123 S.Ct. 1994] (plur. opn. of Thomas, J.) (*Chavez*) [witness may insist on immunity agreement before being compelled to give testimony in noncriminal case]; *Lefkowitz v. Cunningham* (1977) 431 U.S. 801, 806 [53 L.Ed.2d 1, 97 S.Ct. 2132] (*Cunningham*) ["government cannot penalize assertion of the constitutional privilege against compelled self-incrimination by imposing sanctions to compel testimony which has not been immunized"]; *Turley, supra*, 414 U.S. 70, 78 ["witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant"]; *Stevens v. Marks* (1966) 383 U.S. 234, 246 [15 L.Ed.2d 724, 86 S.Ct. 788] [witness has "constitutional right to stand on the privilege against self-incrimination until it has been fairly demonstrated to him that an immunity, as broad in scope as the privilege it replaces, is available and applicable to him"].)

Several cases have squarely held that persons could not be sanctioned when, in noncriminal proceedings, they invoked the constitutional privilege to refuse to answer official questions, or to produce materials potentially subject to the privilege, even though they received official assurances that no criminal use of the evidence sought was contemplated, and even though they could move to suppress the evidence produced if the prosecution later attempted such criminal use. (E.g., *Maness v. Meyers* (1975) 419 U.S. 449, 452, 461–463 [42 L.Ed.2d 574, 95 S.Ct. 584] [one served with subpoena for production of sexually explicit magazines as evidence for civil injunction against distribution of obscene materials was not required to let "cat out of the bag" before testing whether his invocation of Fifth Amendment privilege was valid]; but see *id.*, at p. 475 (conc. opn. of White, J.) [formal immunity is "functional equivalent" of rule that neither incriminating answers nor their fruits can be used criminally]; see *United States v. Doe* (1984) 465 U.S. 605 [79 L.Ed.2d 552, 104 S.Ct. 1237] (*Doe*) [before compelling citizen's production, over Fifth Amendment objection, of potentially incriminating business records for non-penal purpose, government must follow strict procedures of statute allowing

United States Attorney to seek court-conferred criminal use immunity; prosecutor's informal promise not to use materials criminally is insufficient; statute is intended to require government to balance interest in obtaining material against risk of hindrance to future prosecution if immunity is granted]; *Pillsbury Co. v. Conboy* (1983) 459 U.S. 248 [74 L.Ed.2d 430, 103 S.Ct. 608] (*Conboy*) [deponent questioned in civil case about content and truth of his previously immunized federal grand jury testimony could not be held in contempt for invoking Fifth Amendment rights at deposition; deponent was not required to rely on mere predictive judgment that, in any subsequent criminal prosecution against him, court would suppress civil deposition testimony as covered by prior immunity]; see also *Marchetti v. United States* (1968) 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697] (*Marchetti*) [professional bookmaker subject to special tax on proceeds of illegal wagering could not be convicted of violating registration provisions of Internal Revenue Code over defense that compliance would require self-incrimination; Supreme Court would not clear way for enforcement of registration provisions by judicially imposing restrictions on criminal use of information derived, since Congress, not courts, should balance criminal versus revenue-producing uses of registration requirement]; cf. *Byers v. Justice Court* (1969) 71 Cal.2d 1039 [80 Cal.Rptr. 553, 458 P.2d 465] (*Byers*) [absent prior judicial rule conferring criminal use immunity, one involved in auto collision could not be convicted for leaving accident scene without disclosing self-identifying information, as required by hit-and-run law; though purpose of disclosure statute was to protect accident victims from financial loss, required disclosures were potentially self-incriminatory].)[4]

California statutes set forth various circumstances in which persons whose potentially incriminating statements are required for reasons other than criminal prosecution are, or may or must be, afforded immunity from the criminal use of, or prosecution for, the immunity matters discussed in their compelled answers. (See, e.g., Pen. Code, § 1324 [prosecutor may request judicial immunity for witness in felony proceeding]; Gov. Code, § 3253, subd. (e)(1), as added by Stats. 2007, ch. 591, § 2 [firefighter must receive formal written offer of criminal transactional immunity before being required to answer employer's incriminating questions]; Gov. Code, §§ 18676, 18677 [one called to testify in civil service investigation by State Personnel Board cannot be excused on grounds of self-incrimination privilege if granted criminal transactional or use immunity]; Gov. Code, § 83119 [one compelled, over self-incrimination objection, to testify before Fair Political Practices

---

[4] The judgment in *Byers* was vacated, and the cause remanded, in *California v. Byers* (1971) 402 U.S. 424 [29 L.Ed.2d 9, 91 S.Ct. 1535]. The high court majority held that facially neutral disclosure requirements contained in regulatory statutes such as California's accident disclosure law, where the criminal implications are not substantial, do not violate the Fifth Amendment.

Commission has criminal transactional immunity with respect to matters disclosed]; Corp. Code, § 25531, subd. (e) [person compelled, over self-incrimination objection, to testify before Corporations Commissioner in securities fraud investigation has criminal transactional immunity with respect to matters disclosed].)

Plaintiff and the Court of Appeal thus have derived the premise that "immunity," on the one hand, and the right to exclusion from evidence in a subsequent prosecution, on the other, are two separate concepts that may not be conflated. As the Court of Appeal reasoned, one subjected to coercive official questioning in a noncriminal setting is constitutionally privileged to *refuse to answer unless personally immunized*, and, if personal immunity is denied, or is unavailable from an authorized source, the person *cannot be sanctioned* for *remaining silent*, but if one *does* speak under official compulsion, without the protection of formal immunity, the Constitution nonetheless prohibits direct or derivative use of the statements in a criminal prosecution against the declarant.

■ Whatever the general merits of this principle, federal and California courts have taken a different tack in cases involving noncriminal investigations of the job performance of public employees. Given the paramount duty of public employees to their employers, and the importance of ensuring the proper performance of public duties, the decisions consistently indicate that a public employee may be compelled, upon threat of job discipline, to answer questions about his or her job performance, so long as the employee is not also required to *surrender* the constitutional privilege against criminal use of any statements thereby obtained.

■ As we will explain, the United States Supreme Court has explicitly stated that the Fifth Amendment does not prevent a public employer from disciplining an employee who refuses to answer official job-related questions, where there is no further requirement that the employee forfeit the privilege against self-incrimination and agree that the answers thus compelled may be used in a criminal prosecution against the employee. The court has never held, in the context of a noncriminal investigation of public employee job performance, that an employee must be offered *formal immunity* from criminal use before being compelled, by threat of job discipline, to answer questions on that subject.

Lower federal courts, and California courts other than the instant Court of Appeal, have thus consistently concluded that the Constitution does not require a public employer to obtain and provide an affirmative grant of criminal use immunity before using the threat of job discipline to compel answers from its employee in the course of an investigation of job performance. Rather, these cases hold the employee may be punished for refusal to

answer the employer's job-related questions if he or she is not required to *surrender* the constitutional privilege against criminal use of the statements thereby obtained. Over four decades, the Supreme Court has declined numerous opportunities to overturn these decisions. No reason appears to depart from the rule thus well established.

Thus, in *Garrity*, police officers were questioned by the state attorney general's office, which was acting pursuant to broad court-conferred authority to investigate the fixing of traffic tickets. A state statute called for the forfeiture of public employment by one who invoked the Fifth Amendment, or refused to waive immunity, in response to official questioning about his or her job performance. Accordingly, each officer was warned that anything he said could be used against him in a criminal prosecution, that he could refuse, on grounds of his constitutional privilege, to provide self-incriminating answers, but that if he did so, he would be dismissed. In other words, the officers were told that unless they waived their constitutional right against self-incrimination, they would lose their jobs.

Though preserving their constitutional objections, the officers answered, and their answers were used to convict them of conspiracy to obstruct administration of the traffic laws. Deeming the answers coerced, the high court reversed the convictions, holding that the Fifth Amendment right against self-incrimination, as incorporated in the Fourteenth Amendment, "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." (*Garrity, supra*, 385 U.S. 493, 500.)

■ Subsequent to *Garrity*, in two cases decided the same day, the high court provided additional insight about the Fifth Amendment rights of public employees under investigation in connection with their job performance. In the first case, *Gardner v. Broderick* (1968) 392 U.S. 273 [20 L.Ed.2d 1082, 88 S.Ct. 1913] (*Gardner*), a New York City police officer subpoenaed before a grand jury prior to the *Garrity* decision was asked to sign a waiver of his privilege against self-incrimination. Pursuant to provisions of the New York Constitution and the city charter, he was told his refusal to do so would lead to his discharge from public employment. When he refused to sign the waiver, he was fired, and he sought reinstatement. The state court dismissed his petition. The Supreme Court reversed, holding that the privilege against self-incrimination "does not tolerate the attempt, regardless of its ultimate effectiveness, to coerce a waiver of the *immunity it confers* on penalty of the loss of employment." (*Id.*, at p. 279, italics added.)

Arguing for a contrary result, the city sought, among other things, to distinguish *Spevack v. Klein* (1967) 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct.

625], decided the same day as *Garrity*. *Spevack* held that an attorney could not be disbarred solely for refusing, on grounds of his privilege against self-incrimination, to testify at a disciplinary hearing. In *Gardner*, the city asserted that different considerations should apply "in the case of a public official such as a policeman." (*Gardner, supra*, 392 U.S. 273, 277.) "Unlike the lawyer," the city argued, the public officer "is directly, immediately, and entirely responsible to the city or State which is his employer. He owes his entire loyalty to it. He has no other 'client' or principal. He is a trustee of the public interest, bearing the burden of great and total responsibility to his public employer. Unlike the lawyer who is directly responsible to his client, the policeman is either responsible to the State or to no one." (*Id.*, at pp. 277–278.)

"We agree," the *Gardner* court responded, "that these factors differentiate the situations. If appellant, a policeman, had refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, *without being required to waive his immunity* with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself, . . . the privilege against self-incrimination *would not have been a bar to his dismissal*." (*Gardner, supra*, 392 U.S. 273, 278, fn. & citation omitted, italics added.)

The second case, *Sanitation Men v. Sanitation Comm'r* (1968) 392 U.S. 280 [20 L.Ed.2d 1089, 88 S.Ct. 1917] (*Sanitation Men I*), concerned a New York City commission's investigation, again prior to the *Garrity* decision, of suspected corrupt acts by city sanitation employees. Fifteen suspected employees were called to testify before the commission. Pursuant to the city charter, they were told that if they invoked the privilege against self-incrimination to avoid testifying about their own job conduct, or that of other employees, they would be discharged. Twelve of the employees refused to testify before the commission and, on that sole ground, were dismissed. Three answered questions, denying the charges against them. Subsequently, these three were summoned before a grand jury and asked to sign waivers of immunity. They refused, and were then dismissed for that sole reason.

The federal court of appeals upheld the dismissals. However, the Supreme Court reversed on the grounds elaborated in *Gardner*, holding again that the Fifth Amendment forbids dismissal from public employment for refusal to surrender the privilege against self-incrimination. Nonetheless, the high court observed, "As we stated in *Gardner* . . . , if New York had demanded that petitioners answer questions specifically, directly, and narrowly relating to the performance of their official duties on pain of dismissal . . . *without requiring relinquishment of the benefits of the constitutional privilege*, and if they had refused to do so, this case would be entirely different. In such a case, the

employee's right to immunity as a result of his compelled testimony would not be at stake." (*Sanitation Men I, supra,* 392 U.S. 280, 284, italics added.) The court made clear that public employees, like all other citizens, are entitled to the privilege against self-incrimination. Nonetheless, the court cautioned, "petitioners, being public employees, subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, *which do not involve an attempt to coerce them to relinquish their constitutional rights.*" (*Id.,* at p. 285, italics added.)

As a consequence of the decision in *Sanitation Men I,* the public employees at issue in that case were reinstated. Thereafter, they were recalled to appear before a senior city sanitation official. Before being questioned on this occasion, each of the employees—all of whom were represented by counsel—was advised by the official that the employee had all rights guaranteed by New York law and the federal and state Constitutions, and that these included the right to remain silent, although refusal to answer material and relevant questions about his job conduct might subject the employee to disciplinary action. Each employee was further told, in light of *Garrity, Gardner,* and *Sanitation Men I,* that any answers he gave could not be used in a criminal prosecution against him, except in a perjury prosecution stemming from the falsity of any answers. Beyond this advisement, the employees received no formal grant or offer of criminal immunity.

Again the employees refused to answer substantive questions about their participation in the suspected corrupt scheme. Accordingly, they were suspended and, ultimately, dismissed.

In the employees' federal reinstatement action, both parties moved for summary judgment. The district court granted the employees' motion and denied the city's. The court concluded that under New York's criminal procedure statutes, the city lacked authority to confer any form of criminal immunity necessary to supplant the Fifth Amendment privilege and permit the city to compel the employees' answers on pain of dismissal.

■ In *Uniformed S. M. Ass'n, Inc. v. Commissioner of S. of N. Y.* (2d Cir. 1970) 426 F.2d 619 (*Sanitation Men II*), the federal court of appeals reversed. The court reasoned that there need be no statute conferring the criminal use immunity required to discharge a public employee who refuses, on self-incrimination grounds, to answer job-related questions. The court asserted that, in *Garrity,* "the very act of the attorney general in telling the witness that he would be subject to removal if he refused to answer was held to have conferred such immunity," and in *Adams,* the high court observed that when one is compelled to give a self-incriminating statement, the Fifth Amendment confers immunity directly, without the necessity of a statute. (*Sanitation Men II, supra,* at p. 626.)

In any event, the court noted that in *Gardner*, "Justice Fortas stated in so many words that if a public officer is asked about performance of his official duties *and is not required to waive immunity*, the privilege is not a bar to his dismissal for refusal to answer. [Justice Fortas] said nothing about a statutory grant of immunity[,] and the citation of *Garrity* [in the *Gardner* opinion] shows why nothing needed to be said. . . . The proceeding here involved no attempt to coerce relinquishment of constitutional rights, because public employees do not have an absolute constitutional right to refuse to account for their official actions and still keep their jobs; their right, conferred by the Fifth Amendment itself, . . . is simply that neither what they say under such compulsion nor its fruits can be used against them in a subsequent prosecution." (*Sanitation Men II, supra*, 426 F.2d 619, 627, italics added.)

Accordingly, the federal court of appeals ordered the federal district court to enter summary judgment for the city. With only Justice Douglas's dissenting vote, the United States Supreme Court denied certiorari. (*Uniformed Sanitation Men Assn., Inc., et al. v. Commissioner of Sanitation of the City of New York et al.* (1972) 406 U.S. 961 [32 L.Ed.2d 349, 92 S.Ct. 2055].)

Consistent with *Sanitation Men II*, many lower federal court cases have since held that the Fifth Amendment does not require a formal, affirmative grant of immunity before a public employee may be dismissed for his or her blanket refusal to answer official questions about performance of the employee's public duties, so long as the employee is not required to surrender the constitutional privilege against the direct or derivative use of his or her statements in a subsequent criminal prosecution. (E.g., *Aguilera v. Baca* (9th Cir. 2007) 510 F.3d 1161, 1171–1172 (*Aguilera*), cert. denied (2008) ___ U.S. ___ [172 L.Ed.2d 355, 129 S.Ct. 487]; *Hill v. Johnson* (8th Cir. 1998) 160 F.3d 469, 471; *Harrison v. Wille* (11th Cir. 1998) 132 F.3d 679, 683; *Wiley v. Mayor and City Council of Baltimore* (4th Cir. 1995) 48 F.3d 773, 777, cert. denied (1995) 516 U.S. 824 [133 L.Ed.2d 45, 116 S.Ct. 89]; *Arrington v. County of Dallas* (5th Cir. 1992) 970 F.2d 1441, 1446; *Hester v. City of Milledgeville* (11th Cir. 1985) 777 F.2d 1492, 1496; see *Weston v. U.S. Dept. of Housing & Urban Dev.* (Fed. Cir. 1983) 724 F.2d 943, 947–948 (*Weston*); *Gulden v. McCorkle* (5th Cir. 1982) 680 F.2d 1070, 1073–1074, cert. denied (1983) 459 U.S. 1206 [75 L.Ed.2d 439, 103 S.Ct. 1194]; *Confederation of Police v. Conlisk* (7th Cir. 1973) 489 F.2d 891, 894–895 (*Confederation of Police*), cert. denied *sub nom. Rochford v. Confederation of Police* (1974) 416 U.S. 956 [40 L.Ed.2d 307, 94 S.Ct. 1971].)

California cases postdating *Garrity*, *Gardner*, and *Sanitation Men I*—including decisions of this court—are to similar effect. In *Szmaciarz v. State Personnel Bd.* (1978) 79 Cal.App.3d 904 [145 Cal.Rptr. 396], a corrections officer faced administrative charges for bringing marijuana cigarettes into the

prison. Questioned at his disciplinary hearing, he invoked the Fifth Amendment, and was nonetheless ordered to answer, receiving no offer of immunity in the process. He did respond under protest, admitting he carried the contraband into the facility. He received a seven-month suspension. He sought mandamus to overturn the suspension, claiming he should have been allowed at the hearing to exercise his privilege against self-incrimination. The Court of Appeal disagreed. Citing the pertinent United States Supreme Court decisions, the court held that he could be compelled, for disciplinary purposes, to answer questions pertaining to his job performance, although no criminal use could be made of his answers. (*Id.*, at pp. 917–918.)

In *Kelly v. State Personnel Bd.* (1979) 94 Cal.App.3d 905 [156 Cal.Rptr. 795], a state criminalist was terminated for refusing to provide requested information during an internal investigation of allegations that he supplied illegal drugs, including some from evidence, to a third person. He had been advised that any information he provided could not be used against him in a criminal prosecution. His petition for mandate, seeking reinstatement, was denied, and the Court of Appeal affirmed. Justice Reynoso's opinion noted that the appeal involved only associational and privacy issues, not the petitioner's Fifth Amendment rights. On the latter score, Justice Reynoso observed, "[i]t is settled that a public employee may be required to answer questions relative to his fitness for his employment if his answers cannot be used against him in a subsequent criminal proceeding. [Citation.] If the employee still refuses to answer questions relevant to his official duties then he may be dismissed. [Citation.]" (94 Cal.App.3d at p. 911.)

In *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822 [221 Cal.Rptr. 529, 710 P.2d 329] (*Lybarger*), a police officer, Lybarger, was interviewed by the department's internal affairs division, which was investigating serious allegations of misconduct in his unit. He was advised that a criminal investigation was also pending, and that refusal to cooperate with the internal affairs inquiry would be insubordination, which might lead to dismissal. He was then ordered to answer questions and refused to do so. At a subsequent disciplinary hearing, he testified he acted on advice of counsel. He was terminated for disobeying the order. The superior court denied his petition for mandate seeking reinstatement.

On appeal, Lybarger asserted violations of his rights under the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq.). He pointed out that Government Code section 3304, subdivision (a) forbids "punitive action" against an officer for "lawful[ly] excercis[ing] . . . the rights granted under this chapter," which rights included, under Government Code section 3303, former subdivision (g) (now subd. (h)), the right immediately to

be informed of his constitutional rights "[i]f prior to or during the interrogation . . . it [was] deemed that he or she [might] be charged with a criminal offense . . . ."

Under this scheme, Lybarger asserted, he could not be disciplined solely by reason of his exercise of his constitutional right to remain silent. Moreover, he insisted, he had been denied his statutory right to be *advised* of his constitutional rights where it was "deemed" that criminal charges might be filed.

■ Addressing the first issue, the majority made clear that Lybarger "had neither a constitutional nor a statutory right to remain silent *free of administrative sanction.* As a matter of constitutional law, it is well established that a public employee has no absolute right to refuse to answer potentially incriminating questions posed by his employer. *Instead, his self-incrimination rights are deemed adequately protected by precluding any use of his statements at a subsequent criminal proceeding.* [Citing *Turley, supra,* 414 U.S. 70, 77–79, and *Garrity, supra,* 385 U.S. 493, 500.]" (*Lybarger, supra,* 40 Cal.3d 822, 827, italics added.)

On the other hand, the majority then held that Lybarger's interrogators had violated his *statutory* right to an *advisement* that he had a constitutional right to remain silent, subject to disciplinary action for doing so, but that his statements obtained under threat of discipline could not be used against him in a criminal prosecution. The omission of such an advisement, the majority concluded, was prejudicial, and Lybarger's dismissal for refusing to answer questions was therefore invalid. (*Lybarger, supra,* 40 Cal.3d 822, 828–830.)

In *Williams v. City of Los Angeles* (1988) 47 Cal.3d 195 [252 Cal.Rptr. 817, 763 P.2d 480] (*Williams*), we addressed a similar police internal investigation involving Lybarger's partner, Officer Williams. We reiterated our conclusion that the Constitution gives a public employee no absolute right to refuse to answer incriminating employer questions, but instead adequately protects the employee's rights by precluding use of any compelled statements in aid of a criminal prosecution. (*Id.,* at p. 199.) Like Lybarger, Williams also claimed his statutory advisement rights had been violated. Unlike Lybarger, however, Williams had answered the questions posed to him, and had been dismissed on the basis of the incriminating information he provided. This court concluded that omission of the statutory advisement, though improper, did not warrant invalidating Williams's dismissal for admitted misconduct on duty. (*Id.,* at pp. 201–206.)[5]

---

[5] As noted, *Lybarger* and *Williams* confirmed that by virtue of a *statute* applicable specifically to peace officers (Gov. Code, § 3303, subd. (h) (formerly subd. (g)), such an officer, before being required to answer an employer's investigatory questions, must be

Finally, in *Long Beach City Employees Assn. v. City of Long Beach* (1986) 41 Cal.3d 937 [227 Cal.Rptr. 90, 719 P.2d 660] (*Long Beach*), we addressed a statute requiring every nonsafety public employee to undergo polygraph testing that involved intrusive, wide-ranging questions about the employee's childhood, past drug use, history of petty crimes, and the like. We accepted plaintiff employees' contention that this testing violated the California constitutional right of privacy. Nonetheless, we restated, as "correct," the *Gardner* rule that "a public employee may be required—on pain of dismissal—to answer questions 'specifically, directly, and narrowly relating to the performance of his official duties.' [Citations.]" (*Id.*, at p. 947.) Thus, we said, "[i]f the City had demanded only that its employees answer questions pertaining directly to performance of their duties upon pain of dismissal, without using the intrusive intermediary of polygraph testing, then this case would be entirely different. [Citation.]" (*Ibid.*)

■ We are therefore persuaded that neither the federal nor the California constitutional privilege against compelled self-incrimination requires a public employer to provide its employee with a formal grant of criminal use immunity before it can require the employee, upon threat of job discipline, to answer questions relating to the employee's job performance. On the contrary, the employer may discipline, and even dismiss, a public employee for refusing, on grounds of the constitutional privilege, to answer the employer's job-related questions, so long as the employee is not required, as a condition of remaining in the job, to *surrender* his or her right against criminal use of the statements thus obtained—at least where, as here, the employee is specifically advised that he or she retains that right. (See fn. 5, *ante.*)

As the high court suggested in *Gardner*, the competing public and personal interests are best reconciled by such a rule. In performing their official functions, government officers and employees owe unique duties of loyalty, trust, and candor to their employers, and to the public at large. (*Long Beach, supra*, 41 Cal.3d 937, 952.) Public agencies must be able promptly to investigate and discipline their employees' betrayals of this trust. In the vast majority of cases, the urgent *administrative* need to root out and eliminate

informed of his or her constitutional rights if there appears a possibility the officer will be charged with a criminal offense. (*Lybarger, supra*, 40 Cal.3d 822, 828–829; *Williams, supra*, 47 Cal.3d 195, 200–201.) In a concurring opinion in *Lybarger*, Chief Justice Bird argued that the right to an appropriate admonition might itself be constitutional in nature. (*Lybarger, supra*, at pp. 833–834 (conc. opn. of Bird, C. J.).) Several federal courts of appeal have suggested that, although the federal Constitution does not require *formal immunity* for public employees before they must answer their employers' questions, it may require appropriate *advisements* that the compelled answers may not be used against the employees in criminal prosecutions. (See, e.g., *Weston, supra*, 724 F.2d 943, 948; *Confederation of Police, supra*, 489 F.2d 891, 894; *Sanitation Men II, supra*, 426 F.2d 619, 627; but see *Aguilera, supra*, 510 F.3d 1161, 1172, fn. 6.) We need not decide that issue here, however, for it is undisputed that such advisements were given in the case at hand.

misfeasance or malfeasance by public employees takes priority over any penal implications. (See discussion, *post.*) The Constitution cannot mean that a public employee may refuse with impunity to account for his or her performance on the public payroll, and may delay the progress of an employer's inquiry, unless and until he or she obtains a formal and legally binding guarantee that any statements obtained by the employer will never be used to prosecute the employee on criminal charges.

Indeed, as the instant Court of Appeal conceded, it is not clear how the public employer could even obtain such a formal grant of immunity. No constitutional or statutory provision specifically authorizes any official or public agency to confer such a legally binding guarantee under these circumstances.[6] The employer's ability to investigate an employee's performance of his or her public responsibility cannot be hamstrung, as a matter of constitutional law, by such concerns.[7]

Despite these considerations, the Court of Appeal cited several grounds for its insistence that formal immunity is required in such cases. For example, the court noted that in *Turley* and *Cunningham*, public employee cases decided after *Gardner* and *Sanitation Men I*, the high court adhered to language suggesting that, unless previously immunized, and aside from any exclusionary rule, one cannot be compelled, over invocation of the Fifth Amendment privilege, to give self-incriminating answers to official questions. (See *Turley, supra*, 414 U.S. 70, 78; *Cunningham, supra*, 431 U.S. 801, 805–806.)

For several reasons, those decisions do not support the Court of Appeal's position. Like *Garrity*, *Gardner*, and *Sanitation Men I*, both *Turley* and *Cunningham* involved statutes providing that public employees and public contractors would forfeit those positions unless they *agreed to waive* their Fifth Amendment privileges when called as witnesses before a grand jury. Neither case involved a public employer that sought only to call its own employee to account, while assuring the employee that any statements

---

[6] Plaintiff urges that such authority may be found in Penal Code section 1324, which authorizes a district attorney or other prosecuting agency to request a judicial order granting a witness transactional or use immunity under certain circumstances. But when the section is read in context, it clearly applies only in "felony proceeding[s]" or "proceeding[s] before a grand jury for any felony offense." (*Ibid.*) The statute does not, by its terms, empower the prosecutorial authorities, or a court, to confer advance immunity on a public employee simply because the latter is refusing, on grounds of the privilege against self-incrimination, to answer the employer's job-related questions.

[7] The Court of Appeal considered whether courts have, and should exercise, an inherent unilateral power to confer, or declare, an immunity in such cases. However, the court declined to exercise any such power, concluding it would interfere with the ability of prosecutors to decide, on a case-by-case basis, whether criminal investigations would be unduly hindered by conferring immunity on employees who were resisting employer inquiries. (See further discussion, *post.*)

thereby obtained *could not* be used criminally against the worker. Thus, no issue of *prior* immunity was before the court in either instance. Nonetheless, citing *Gardner*, the court in *Cunningham* reiterated that "[p]ublic employees may constitutionally be discharged for refusing to answer potentially incriminating questions concerning their official duties if they have not been required to *surrender* their constitutional immunity." (*Cunningham, supra*, 431 U.S. 801, 806, italics added; see *Chavez, supra*, 538 U.S. 760, 768 (plur opn. of Thomas, J.).)

The Court of Appeal also reasoned that sole reliance on an exclusionary rule to protect a public employee's rights against self-incrimination creates a logical paradox. An exclusionary rule, the court posited, is intended to prevent the criminal use of *illegally compelled* statements, not to *legalize* what would otherwise be the unconstitutional compulsion of self-incriminatory utterances.

■ But this premise is exaggerated, if not entirely mistaken. The state and federal self-incrimination clauses say one cannot be made an involuntary witness against himself, or herself, *in a criminal proceeding*. Thus, they do not prohibit officially compelled admissions of wrongdoing as such. They only forbid the *criminal use* of such statements against the declarant. Constitutionally based prophylactic rules, such as a prior-immunity requirement in some cases, have arisen to protect the core privilege, but the right against self-incrimination is not itself violated until statements obtained by compulsion are *used* in criminal proceedings against the person from whom the statements were obtained. (*Chavez, supra*, 538 U.S. 760, 767–773 (plur. opn. of Thomas, J.); see also *id.*, at pp. 777–778 (conc. opn. of Souter, J.).)

As the high court has made clear, the Constitution affords a public employee no right to refuse to account for his or her job performance, or to avoid dismissal as punishment for such a refusal. It simply forbids use of the compelled statements, or the fruits thereof, in a criminal prosecution against the employee. When a public employer demands job-related information from its employee, while advising that the employee does not thereby surrender the constitutional right against use of the information in a subsequent criminal prosecution, the employer acts legally. In such circumstances, the employee's constitutional right against self-incrimination is thus directly and precisely satisfied "by precluding any use of his statements at a subsequent criminal proceeding. [Citations.]" (*Lybarger, supra*, 40 Cal.3d 822, 827.)

Finally, the Court of Appeal expressed special concern about a rule that, in essence, would allow a public employer to confer automatic, unilateral criminal use immunity on its employee by compelling the employee to make self-incriminating statements in the course of an internal disciplinary investigation. The Court of Appeal worried that, by placing immunity control in the

employer's hands alone, such an approach might unfairly hinder prosecutors' later attempts to pursue criminal charges against the employee. This is because the prosecution, despite its lack of participation in the decision to grant immunity, would nonetheless shoulder, as its "heavy burden" (*Kastigar, supra,* 406 U.S. 441, 461), "the affirmative duty to prove [in any such criminal case] that the evidence it propose[d] to use [was] derived from a legitimate source wholly independent of the compelled testimony" (*id.,* at p. 460).

For several reasons, we are not persuaded. At the outset, we note that whether the *Constitution forbids* the dismissal of a public employee for refusing to answer potentially incriminating questions from an employer that demands no surrender of criminal immunity is distinct from the practical difficulties a prosecutor might later encounter in pursuing a criminal case. The issue before us—whether plaintiff's termination for refusal to answer his employer's questions was constitutionally permissible—does not directly implicate the latter problem.

We realize that, in some cases, courts have pointed to prosecutorial interests as grounds to refrain from inferring a criminal use immunity that would supplant the constitutional privilege and allow the government to compel incriminating disclosures in noncriminal settings. Thus, in *Conboy, supra,* 459 U.S. 248, and *Doe, supra,* 465 U.S. 605, the high court concluded that a federal statute gave certain Department of Justice officials the exclusive power to seek criminal use immunity, and was intended thereby to require the government, in each individual case, to balance its prosecutorial needs against other interests before compelling constitutionally protected disclosures. Similarly, in *Marchetti, supra,* 390 U.S. 39, the court indicated that it was for Congress, not the courts, to decide whether the income tax registration laws governing illegal wagering activities served revenue or criminal enforcement purposes. And in *Daly v. Superior Court* (1977) 19 Cal.3d 132 [137 Cal.Rptr. 14, 560 P.2d 1193], we declined to find that courts, without any participation by the People, have the inherent power to immunize, and then compel, potentially incriminating deposition answers demanded in a wrongful death lawsuit between private parties.

On the other hand, in *Byers,* we imposed a prospective rule of criminal use immunity for potentially incriminatory accident scene disclosures required by California hit-and-run laws, thus allowing punishment of drivers who thereafter failed to provide such disclosures. Balancing the competing interests, we adjudged that "criminal prosecutions of drivers involved in accidents will not be unduly hampered" by such a rule (*Byers, supra,* 71 Cal.2d 1039, 1056), and that the Legislature, which enacted the disclosure provisions to protect

accident victims against financial loss, would prefer that purpose to be upheld despite the incidental effects on criminal enforcement of the traffic laws (*id.*, at p. 1055).

And in *People v. Superior Court (Kaufman)* (1974) 12 Cal.3d 421 [115 Cal.Rptr. 812, 525 P.2d 716], we held that a court, using its powers under the civil discovery statutes, could grant appropriate immunity to allow the State of California, in *its* civil action claiming violations of the unfair competition law, to compel relevant deposition answers. We reasoned that an immunity order in a civil enforcement action by the state itself "would not frustrate but would further the legislative purpose of suppressing deceptive advertising. Nor would it unduly hamper the prosecution of persons who, in the judgment of the authorities, should be subjected to criminal proceedings. [Citations.]" (*Id.*, at pp. 428–429.)

■     Similarly here, the competing interests favor the settled rule that, absent a contrary statute, a public employer, acting for noncriminal reasons, may demand answers from its own employee about the employee's job conduct and may discipline the employee's refusal to cooperate, without first involving the prosecuting authorities in a decision about granting formal immunity. The vast majority of such cases are unlikely to have criminal implications; on the other hand, the public employer must be able to act promptly and freely, in its administrative capacity, to investigate and remedy misconduct and breaches of trust by those serving on the public payroll. This strong interest outweighs the incidental effect on enforcement of criminal laws that may arise from the rule that statements thus compelled by the employer cannot be used in aid of a later criminal prosecution against the employee.[8]

■     Accordingly, we confirm that neither the federal nor the California Constitution allowed plaintiff, free of any sanction, to refuse to answer his employer's questions about his possible job misconduct unless and until he received, in advance, a formal grant of immunity from subsequent criminal use of his statements. Here, as noted, plaintiff's employer did not require him to *waive* his constitutional privilege against such criminal use. On the contrary, plaintiff was accurately advised, on more than one occasion, that any statements he made under compulsion in connection with the employer's internal disciplinary investigation could not be used against him in a criminal case. Under these circumstances, plaintiff's dismissal, insofar as based on

---

[8] In amicus curiae briefs supporting the county, the Attorney General, the California State Sheriffs' Association and the California Police Chiefs Association, and the Sacramento County District Attorney all agree with this view. In particular, the latter officer notes that methods are available to prevent a public employee's prior compelled incriminating statements from tainting a subsequent criminal prosecution.

disobedience of the employer's order to answer questions, was constitutionally valid. To the extent the Court of Appeal held otherwise, its judgment must be reversed.[9]

## DISPOSITION

Insofar as the Court of Appeal held that plaintiff must receive an affirmative offer of formal immunity from criminal use of his statements before he could be dismissed for disobeying his employer's orders to answer questions related to his job performance, its judgment is reversed. In all other respects, the judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

---

[9] Because our conclusion is consistent with decades of federal and state authority, no reason appears why it cannot be applied directly to plaintiff's case. (Cf., e.g., *Bouie v. City of Columbia* (1964) 378 U.S. 347, 352–355 [12 L.Ed.2d 894, 84 S.Ct. 1697] [application to prior conduct of new and unexpected judicial construction of criminal statute violates due process].)